BETHEL SCHOOL DISTRICT NO. 403 ET AL. *v.*
FRASER, A MINOR, ET AL.

No. 84–1667.   Argued March 3, 1986—Decided July 7, 1986

BURGER, C. J., delivered the opinion of the Court, in which WHITE, POWELL, REHNQUIST, and O'CONNOR, JJ., joined. BRENNAN, J., filed an opinion concurring in the judgment, *post*, p. 687. BLACKMUN, J., concurred in the result. MARSHALL, J., *post*, p. 690, and STEVENS, J., *post*, p. 691, filed dissenting opinions.

*William A. Coats* argued the cause for petitioners. With him on the briefs was *Clifford D. Foster, Jr.*

*Jeffrey T. Haley* argued the cause for respondents. With him on the brief was *Charles S. Sims.**

CHIEF JUSTICE BURGER delivered the opinion of the Court.

We granted certiorari to decide whether the First Amendment prevents a school district from disciplining a high school student for giving a lewd speech at a school assembly.

## I

### A

On April 26, 1983, respondent Matthew N. Fraser, a student at Bethel High School in Pierce County, Washington, delivered a speech nominating a fellow student for student elective office. Approximately 600 high school students, many of whom were 14-year-olds, attended the assembly. Students were required to attend the assembly or to report to the study hall. The assembly was part of a school-sponsored educational program in self-government. Students who elected not to attend the assembly were required to report to study hall. During the entire speech, Fraser re-

---

*Briefs of *amici curiae* urging reversal were filed for the United States by *Solicitor General Fried, Assistant Attorney General Willard, Deputy Solicitor General Kuhl, Anthony J. Steinmeyer,* and *Robert V. Zener;* for the Pacific Legal Foundation et al. by *Ronald A. Zumbrun, John H. Findley,* and *George Nicholson;* and for the Texas Council of School Attorneys by *Jean F. Powers* and *David Crump.*

Briefs of *amici curiae* urging affirmance were filed for the American Booksellers Association et al. by *Ronald Coles;* for the Freedom to Read Foundation by *James A. Klenk;* for the National Education Association by *Michael D. Simpson;* and for the Student Press Law Center by *J. Marc Abrams.*

*Gwendolyn H. Gregory, August W. Steinhilber,* and *Thomas A. Shannon* filed a brief for the National School Boards Association as *amicus curiae.*

ferred to his candidate in terms of an elaborate, graphic, and explicit sexual metaphor.

Two of Fraser's teachers, with whom he discussed the contents of his speech in advance, informed him that the speech was "inappropriate and that he probably should not deliver it," App. 30, and that his delivery of the speech might have "severe consequences." *Id.*, at 61.

During Fraser's delivery of the speech, a school counselor observed the reaction of students to the speech. Some students hooted and yelled; some by gestures graphically simulated the sexual activities pointedly alluded to in respondent's speech. Other students appeared to be bewildered and embarrassed by the speech. One teacher reported that on the day following the speech, she found it necessary to forgo a portion of the scheduled class lesson in order to discuss the speech with the class. *Id.*, at 41–44.

A Bethel High School disciplinary rule prohibiting the use of obscene language in the school provides:

> "Conduct which materially and substantially interferes with the educational process is prohibited, including the use of obscene, profane language or gestures."

The morning after the assembly, the Assistant Principal called Fraser into her office and notified him that the school considered his speech to have been a violation of this rule. Fraser was presented with copies of five letters submitted by teachers, describing his conduct at the assembly; he was given a chance to explain his conduct, and he admitted to having given the speech described and that he deliberately used sexual innuendo in the speech. Fraser was then informed that he would be suspended for three days, and that his name would be removed from the list of candidates for graduation speaker at the school's commencement exercises.

Fraser sought review of this disciplinary action through the School District's grievance procedures. The hearing officer determined that the speech given by respondent was "indecent, lewd, and offensive to the modesty and decency of

many of the students and faculty in attendance at the assembly." The examiner determined that the speech fell within the ordinary meaning of "obscene," as used in the disruptive-conduct rule, and affirmed the discipline in its entirety. Fraser served two days of his suspension, and was allowed to return to school on the third day.

## B

Respondent, by his father as guardian ad litem, then brought this action in the United States District Court for the Western District of Washington. Respondent alleged a violation of his First Amendment right to freedom of speech and sought both injunctive relief and monetary damages under 42 U. S. C. § 1983. The District Court held that the school's sanctions violated respondent's right to freedom of speech under the First Amendment to the United States Constitution, that the school's disruptive-conduct rule is unconstitutionally vague and overbroad, and that the removal of respondent's name from the graduation speaker's list violated the Due Process Clause of the Fourteenth Amendment because the disciplinary rule makes no mention of such removal as a possible sanction. The District Court awarded respondent $278 in damages, $12,750 in litigation costs and attorney's fees, and enjoined the School District from preventing respondent from speaking at the commencement ceremonies. Respondent, who had been elected graduation speaker by a write-in vote of his classmates, delivered a speech at the commencement ceremonies on June 8, 1983.

The Court of Appeals for the Ninth Circuit affirmed the judgment of the District Court, 755 F. 2d 1356 (1985), holding that respondent's speech was indistinguishable from the protest armband in *Tinker* v. *Des Moines Independent Community School Dist.*, 393 U. S. 503 (1969). The court explicitly rejected the School District's argument that the speech, unlike the passive conduct of wearing a black armband, had a disruptive effect on the educational process. The Court of

Appeals also rejected the School District's argument that it had an interest in protecting an essentially captive audience of minors from lewd and indecent language in a setting sponsored by the school, reasoning that the School District's "unbridled discretion" to determine what discourse is "decent" would "increase the risk of cementing white, middle-class standards for determining what is acceptable and proper speech and behavior in our public schools." 755 F. 2d, at 1363. Finally, the Court of Appeals rejected the School District's argument that, incident to its responsibility for the school curriculum, it had the power to control the language used to express ideas during a school-sponsored activity.

We granted certiorari, 474 U. S. 814 (1985). We reverse.

## II

This Court acknowledged in *Tinker* v. *Des Moines Independent Community School Dist.*, *supra*, that students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Id.*, at 506. The Court of Appeals read that case as precluding any discipline of Fraser for indecent speech and lewd conduct in the school assembly. That court appears to have proceeded on the theory that the use of lewd and obscene speech in order to make what the speaker considered to be a point in a nominating speech for a fellow student was essentially the same as the wearing of an armband in *Tinker* as a form of protest or the expression of a political position.

The marked distinction between the political "message" of the armbands in *Tinker* and the sexual content of respondent's speech in this case seems to have been given little weight by the Court of Appeals. In upholding the students' right to engage in a nondisruptive, passive expression of a political viewpoint in *Tinker*, this Court was careful to note that the case did "not concern speech or action that intrudes upon the work of the schools or the rights of other students." *Id.*, at 508.

It is against this background that we turn to consider the level of First Amendment protection accorded to Fraser's utterances and actions before an official high school assembly attended by 600 students.

## III

The role and purpose of the American public school system were well described by two historians, who stated: "[P]ublic education must prepare pupils for citizenship in the Republic. . . . It must inculcate the habits and manners of civility as values in themselves conducive to happiness and as indispensable to the practice of self-government in the community and the nation." C. Beard & M. Beard, New Basic History of the United States 228 (1968). In *Ambach* v. *Norwick*, 441 U. S. 68, 76–77 (1979), we echoed the essence of this statement of the objectives of public education as the "inculcat[ion of] fundamental values necessary to the maintenance of a democratic political system."

These fundamental values of "habits and manners of civility" essential to a democratic society must, of course, include tolerance of divergent political and religious views, even when the views expressed may be unpopular. But these "fundamental values" must also take into account consideration of the sensibilities of others, and, in the case of a school, the sensibilities of fellow students. The undoubted freedom to advocate unpopular and controversial views in schools and classrooms must be balanced against the society's countervailing interest in teaching students the boundaries of socially appropriate behavior. Even the most heated political discourse in a democratic society requires consideration for the personal sensibilities of the other participants and audiences.

In our Nation's legislative halls, where some of the most vigorous political debates in our society are carried on, there are rules prohibiting the use of expressions offensive to other participants in the debate. The Manual of Parliamentary

Practice, drafted by Thomas Jefferson and adopted by the House of Representatives to govern the proceedings in that body, prohibits the use of "impertinent" speech during debate and likewise provides that "[n]o person is to use indecent language against the proceedings of the House." Jefferson's Manual of Parliamentary Practice §§ 359, 360, reprinted in Manual and Rules of House of Representatives, H. R. Doc. No. 97–271, pp. 158–159 (1982); see *id.*, at 111, n. *a* (Jefferson's Manual governs the House in all cases to which it applies). The Rules of Debate applicable in the Senate likewise provide that a Senator may be called to order for imputing improper motives to another Senator or for referring offensively to any state. See Senate Procedure, S. Doc. No. 97–2, Rule XIX, pp. 568–569, 588–591 (1981). Senators have been censured for abusive language directed at other Senators. See Senate Election, Expulsion and Censure Cases from 1793 to 1972, S. Doc. No. 92–7, pp. 95–98 (1972) (Sens. McLaurin and Tillman); *id.*, at 152–153 (Sen. McCarthy). Can it be that what is proscribed in the halls of Congress is beyond the reach of school officials to regulate?

The First Amendment guarantees wide freedom in matters of adult public discourse. A sharply divided Court upheld the right to express an antidraft viewpoint in a public place, albeit in terms highly offensive to most citizens. See *Cohen v. California,* 403 U. S. 15 (1971). It does not follow, however, that simply because the use of an offensive form of expression may not be prohibited to adults making what the speaker considers a political point, the same latitude must be permitted to children in a public school. In *New Jersey v. T. L. O.,* 469 U. S. 325, 340–342 (1985), we reaffirmed that the constitutional rights of students in public school are not automatically coextensive with the rights of adults in other settings. As cogently expressed by Judge Newman, "the First Amendment gives a high school student the classroom right to wear Tinker's armband, but not Cohen's jacket." *Thomas v. Board of Education, Granville Central School*

*Dist.*, 607 F. 2d 1043, 1057 (CA2 1979) (opinion concurring in result).

Surely it is a highly appropriate function of public school education to prohibit the use of vulgar and offensive terms in public discourse. Indeed, the "fundamental values necessary to the maintenance of a democratic political system" disfavor the use of terms of debate highly offensive or highly threatening to others. Nothing in the Constitution prohibits the states from insisting that certain modes of expression are inappropriate and subject to sanctions. The inculcation of these values is truly the "work of the schools." *Tinker*, 393 U. S., at 508; see *Ambach* v. *Norwick*, *supra*. The determination of what manner of speech in the classroom or in school assembly is inappropriate properly rests with the school board.

The process of educating our youth for citizenship in public schools is not confined to books, the curriculum, and the civics class; schools must teach by example the shared values of a civilized social order. Consciously or otherwise, teachers —and indeed the older students—demonstrate the appropriate form of civil discourse and political expression by their conduct and deportment in and out of class. Inescapably, like parents, they are role models. The schools, as instruments of the state, may determine that the essential lessons of civil, mature conduct cannot be conveyed in a school that tolerates lewd, indecent, or offensive speech and conduct such as that indulged in by this confused boy.

The pervasive sexual innuendo in Fraser's speech was plainly offensive to both teachers and students—indeed to any mature person. By glorifying male sexuality, and in its verbal content, the speech was acutely insulting to teenage girl students. See App. 77–81. The speech could well be seriously damaging to its less mature audience, many of whom were only 14 years old and on the threshold of awareness of human sexuality. Some students were reported as

bewildered by the speech and the reaction of mimicry it provoked.

This Court's First Amendment jurisprudence has acknowledged limitations on the otherwise absolute interest of the speaker in reaching an unlimited audience where the speech is sexually explicit and the audience may include children. In *Ginsberg* v. *New York*, 390 U. S. 629 (1968), this Court upheld a New York statute banning the sale of sexually oriented material to minors, even though the material in question was entitled to First Amendment protection with respect to adults. And in addressing the question whether the First Amendment places any limit on the authority of public schools to remove books from a public school library, all Members of the Court, otherwise sharply divided, acknowledged that the school board has the authority to remove books that are vulgar. *Board of Education* v. *Pico*, 457 U. S. 853, 871–872 (1982) (plurality opinion); *id.*, at 879–881 (BLACKMUN, J., concurring in part and in judgment); *id.*, at 918–920 (REHNQUIST, J., dissenting). These cases recognize the obvious concern on the part of parents, and school authorities acting *in loco parentis*, to protect children—especially in a captive audience—from exposure to sexually explicit, indecent, or lewd speech.

We have also recognized an interest in protecting minors from exposure to vulgar and offensive spoken language. In *FCC* v. *Pacifica Foundation*, 438 U. S. 726 (1978), we dealt with the power of the Federal Communications Commission to regulate a radio broadcast described as "indecent but not obscene." There the Court reviewed an administrative condemnation of the radio broadcast of a self-styled "humorist" who described his own performance as being in "the words you couldn't say on the public, ah, airwaves, um, the ones you definitely wouldn't say ever." *Id.*, at 729; see also *id.*, at 751–755 (Appendix to opinion of the Court). The Commission concluded that "certain words depicted sexual and excretory activities in a patently offensive manner, [and] noted

that they 'were broadcast at a time when children were undoubtedly in the audience.'" The Commission issued an order declaring that the radio station was guilty of broadcasting indecent language in violation of 18 U. S. C. § 1464. 438 U. S., at 732. The Court of Appeals set aside the Commission's determination, and we reversed, reinstating the Commission's citation of the station. We concluded that the broadcast was properly considered "obscene, indecent, or profane" within the meaning of the statute. The plurality opinion went on to reject the radio station's assertion of a First Amendment right to broadcast vulgarity:

> "These words offend for the same reasons that obscenity offends. Their place in the hierarchy of First Amendment values was aptly sketched by Mr. Justice Murphy when he said: '[S]uch utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality.' *Chaplinsky* v. *New Hampshire*, 315 U. S., at 572." *Id.*, at 746.

We hold that petitioner School District acted entirely within its permissible authority in imposing sanctions upon Fraser in response to his offensively lewd and indecent speech. Unlike the sanctions imposed on the students wearing armbands in *Tinker*, the penalties imposed in this case were unrelated to any political viewpoint. The First Amendment does not prevent the school officials from determining that to permit a vulgar and lewd speech such as respondent's would undermine the school's basic educational mission. A high school assembly or classroom is no place for a sexually explicit monologue directed towards an unsuspecting audience of teenage students. Accordingly, it was perfectly appropriate for the school to disassociate itself to make the point to the pupils that vulgar speech and lewd conduct is wholly inconsistent with the "fundamental values" of public

school education. Justice Black, dissenting in *Tinker*, made a point that is especially relevant in this case:

"I wish therefore, . . . to disclaim any purpose . . . to hold that the Federal Constitution compels the teachers, parents, and elected school officials to surrender control of the American public school system to public school students." 393 U. S., at 526.

## IV

Respondent contends that the circumstances of his suspension violated due process because he had no way of knowing that the delivery of the speech in question would subject him to disciplinary sanctions. This argument is wholly without merit. We have recognized that "maintaining security and order in the schools requires a certain degree of flexibility in school disciplinary procedures, and we have respected the value of preserving the informality of the student-teacher relationship." *New Jersey* v. *T. L. O.*, 469 U. S., at 340. Given the school's need to be able to impose disciplinary sanctions for a wide range of unanticipated conduct disruptive of the educational process, the school disciplinary rules need not be as detailed as a criminal code which imposes criminal sanctions. Cf. *Arnett* v. *Kennedy*, 416 U. S. 134, 161 (1974) (REHNQUIST, J., concurring). Two days' suspension from school does not rise to the level of a penal sanction calling for the full panoply of procedural due process protections applicable to a criminal prosecution. Cf. *Goss* v. *Lopez*, 419 U. S. 565 (1975). The school disciplinary rule proscribing "obscene" language and the prespeech admonitions of teachers gave adequate warning to Fraser that his lewd speech could subject him to sanctions.*

---

*Petitioners also challenge the ruling of the District Court that the removal of Fraser's name from the ballot for graduation speaker violated his due process rights because that sanction was not indicated as a potential punishment in the school's disciplinary rules. We agree with the Court of Appeals that this issue has become moot, since the graduation ceremony has long since passed and Fraser was permitted to speak in accordance

The judgment of the Court of Appeals for the Ninth Circuit is

*Reversed.*

JUSTICE BLACKMUN concurs in the result.

JUSTICE BRENNAN, concurring in the judgment.

Respondent gave the following speech at a high school assembly in support of a candidate for student government office:

> "'I know a man who is firm—he's firm in his pants, he's firm in his shirt, his character is firm—but most . . . of all, his belief in you, the students of Bethel, is firm.
>
> "'Jeff Kuhlman is a man who takes his point and pounds it in.   If necessary, he'll take an issue and nail it to the wall.   He doesn't attack things in spurts—he drives hard, pushing and pushing until finally—he succeeds.
>
> "'Jeff is a man who will go to the very end—even the climax, for each and every one of you.
>
> "'So vote for Jeff for A. S. B. vice-president—he'll never come between you and the best our high school can be.'"   App. 47.

The Court, referring to these remarks as "obscene," "vulgar," "lewd," and "offensively lewd," concludes that school officials properly punished respondent for uttering the speech.   Having read the full text of respondent's remarks, I find it difficult to believe that it is the same speech the Court describes.   To my mind, the most that can be said about respondent's speech—and all that need be said—is that in light of the discretion school officials have to teach high school students how to conduct civil and effective public discourse, and to prevent disruption of school educational activities, it was

---

with the District Court's injunction.   No part of the damages award was based upon the removal of Fraser's name from the list, since damages were based upon the loss of two days' schooling.

not unconstitutional for school officials to conclude, under the circumstances of this case, that respondent's remarks exceeded permissible limits. Thus, while I concur in the Court's judgment, I write separately to express my understanding of the breadth of the Court's holding.

The Court today reaffirms the unimpeachable proposition that students do not "'shed their constitutional rights to freedom of speech or expression at the schoolhouse gate.'" *Ante*, at 680 (quoting *Tinker* v. *Des Moines Independent Community School Dist.*, 393 U. S. 503, 506 (1969)). If respondent had given the same speech outside of the school environment, he could not have been penalized simply because government officials considered his language to be inappropriate, see *Cohen* v. *California*, 403 U. S. 15 (1971); the Court's opinion does not suggest otherwise.[1] Moreover, despite the Court's characterizations, the language respondent used is far removed from the very narrow class of "obscene" speech which the Court has held is not protected by the First Amendment. *Ginsberg* v. *New York*, 390 U. S. 629, 635 (1968); *Roth* v. *United States*, 354 U. S. 476, 485 (1957). It is true, however, that the State has interests in teaching high school students how to conduct civil and effective public discourse and in avoiding disruption of educational school activities. Thus, the Court holds that under certain circumstances, high school students may properly be reprimanded for giving a speech at a high school assembly which school officials conclude disrupted the school's educational

---

[1] In the course of its opinion, the Court makes certain remarks concerning the authority of school officials to regulate student language in public schools. For example, the Court notes that "[n]othing in the Constitution prohibits the states from insisting that certain modes of expression are inappropriate and subject to sanctions." *Ante*, at 683. These statements obviously do not, and indeed given our prior precedents could not, refer to the government's authority generally to regulate the language used in public debate outside of the school environment.

mission.[2]  Respondent's speech may well have been protected had he given it in school but under different circumstances, where the school's legitimate interests in teaching and maintaining civil public discourse were less weighty.

In the present case, school officials sought only to ensure that a high school assembly proceed in an orderly manner. There is no suggestion that school officials attempted to regulate respondent's speech because they disagreed with the views he sought to express.  Cf. *Tinker, supra.*  Nor does this case involve an attempt by school officials to ban written materials they consider "inappropriate" for high school students, cf. *Board of Education* v. *Pico,* 457 U. S. 853 (1982), or to limit what students should hear, read, or learn about. Thus, the Court's holding concerns only the authority that school officials have to restrict a high school student's use of disruptive language in a speech given to a high school assembly.

The authority school officials have to regulate such speech by high school students is not limitless.  See *Thomas* v. *Board of Education, Granville Central School Dist.,* 607 F. 2d 1043, 1057 (CA2 1979) (Newman, J., concurring in result) ("[S]chool officials . . . do [not] have limitless discretion to apply their own notions of indecency.  Courts have a First

---

[2] The Court speculates that the speech was "insulting" to female students, and "seriously damaging" to 14-year-olds, so that school officials could legitimately suppress such expression in order to protect these groups.  *Ante,* at 683.  There is no evidence in the record that any students, male or female, found the speech "insulting."  And while it was not unreasonable for school officials to conclude that respondent's remarks were inappropriate for a school-sponsored assembly, the language respondent used does not even approach the sexually explicit speech regulated in *Ginsberg* v. *New York,* 390 U. S. 629 (1968), or the indecent speech banned in *FCC* v. *Pacifica Foundation,* 438 U. S. 726 (1978).  Indeed, to my mind, respondent's speech was no more "obscene," "lewd," or "sexually explicit" than the bulk of programs currently appearing on prime time television or in the local cinema.  Thus, I disagree with the Court's suggestion that school officials could punish respondent's speech out of a need to protect younger students.

Amendment responsibility to insure that robust rhetoric . . . is not suppressed by prudish failures to distinguish the vigorous from the vulgar"). Under the circumstances of this case, however, I believe that school officials did not violate the First Amendment in determining that respondent should be disciplined for the disruptive language he used while addressing a high school assembly.[3] Thus, I concur in the judgment reversing the decision of the Court of Appeals.

JUSTICE MARSHALL, dissenting.

I agree with the principles that JUSTICE BRENNAN sets out in his opinion concurring in the judgment. I dissent from the Court's decision, however, because in my view the School District failed to demonstrate that respondent's remarks were indeed disruptive. The District Court and Court of Appeals conscientiously applied *Tinker* v. *Des Moines Independent Community School Dist.*, 393 U. S. 503 (1969), and concluded that the School District had not demonstrated any disruption of the educational process. I recognize that the school administration must be given wide latitude to determine what forms of conduct are inconsistent with the school's educational mission; nevertheless, where speech is involved, we may not unquestioningly accept a teacher's or administrator's assertion that certain pure speech interfered with education. Here the School District, despite a clear opportunity to do so, failed to bring in evidence sufficient to convince either of the two lower courts that education at Bethel School was disrupted by respondent's speech. I therefore see no reason to disturb the Court of Appeals' judgment.

---

[3] Respondent served two days' suspension and had his name removed from the list of candidates for graduation speaker at the school's commencement exercises, although he was eventually permitted to speak at the graduation. While I find this punishment somewhat severe in light of the nature of respondent's transgression, I cannot conclude that school officials exceeded the bounds of their disciplinary authority.

JUSTICE STEVENS, dissenting.

"Frankly, my dear, I don't give a damn."

When I was a high school student, the use of those words in a public forum shocked the Nation. Today Clark Gable's four-letter expletive is less offensive than it was then. Nevertheless, I assume that high school administrators may prohibit the use of that word in classroom discussion and even in extracurricular activities that are sponsored by the school and held on school premises. For I believe a school faculty must regulate the content as well as the style of student speech in carrying out its educational mission.[1] It does seem to me, however, that if a student is to be punished for using offensive speech, he is entitled to fair notice of the scope of the prohibition and the consequences of its violation.

---

[1] "Because every university's resources are limited, an educational institution must routinely make decisions concerning the use of the time and space that is available for extracurricular activities. In my judgment, it is both necessary and appropriate for those decisions to evaluate the content of a proposed student activity. I should think it obvious, for example, that if two groups of 25 students requested the use of a room at a particular time—one to view Mickey Mouse cartoons and the other to rehearse an amateur performance of Hamlet—the First Amendment would not require that the room be reserved for the group that submitted its application first. Nor do I see why a university should have to establish a 'compelling state interest' to defend its decision to permit one group to use the facility and not the other. In my opinion, a university should be allowed to decide for itself whether a program that illuminates the genius of Walt Disney should be given precedence over one that may duplicate material adequately covered in the classroom. Judgments of this kind should be made by academicians, not by federal judges, and their standards for decision should not be encumbered with ambiguous phrases like 'compelling state interest.'" *Widmar* v. *Vincent*, 454 U. S. 263, 278–279 (1981) (STEVENS, J., concurring in judgment) (footnotes omitted).

"Any student of history who has been reprimanded for talking about the World Series during a class discussion of the First Amendment knows that it is incorrect to state that a 'time, place, or manner restriction may not be based upon either the content or subject matter of speech.'" *Consolidated Edison Co.* v. *Public Service Comm'n of N. Y.*, 447 U. S. 530, 544–545 (1980) (STEVENS, J., concurring in judgment).

The interest in free speech protected by the First Amendment and the interest in fair procedure protected by the Due Process Clause of the Fourteenth Amendment combine to require this conclusion.

This respondent was an outstanding young man with a fine academic record. The fact that he was chosen by the student body to speak at the school's commencement exercises demonstrates that he was respected by his peers. This fact is relevant for two reasons. It confirms the conclusion that the discipline imposed on him—a 3-day suspension and ineligibility to speak at the school's graduation exercises—was sufficiently serious to justify invocation of the School District's grievance procedures. See *Goss* v. *Lopez,* 419 U. S. 565, 574–575 (1975). More importantly, it indicates that he was probably in a better position to determine whether an audience composed of 600 of his contemporaries would be offended by the use of a four-letter word—or a sexual metaphor—than is a group of judges who are at least two generations and 3,000 miles away from the scene of the crime.[2]

The fact that the speech may not have been offensive to his audience—or that he honestly believed that it would be inoffensive—does not mean that he had a constitutional right to deliver it. For the school—not the student—must prescribe the rules of conduct in an educational institution.[3] But it

---

[2] As the Court of Appeals noted, there "is no evidence in the record indicating that any students found the speech to be offensive." 755 F. 2d 1356, 1361, n. 4 (CA9 1985).

In its opinion today, the Court describes respondent as a "confused boy," *ante,* at 683, and repeatedly characterizes his audience of high school students as "children," *ante,* at 682, 684. When a more orthodox message is being conveyed to a similar audience, four Members of today's majority would treat high school students like college students rather than like children. See *Bender* v. *Williamsport Area School Dist.,* 475 U. S. 534 (1986) (dissenting opinions).

[3] See *Arnold* v. *Carpenter,* 459 F. 2d 939, 944 (CA7 1972) (STEVENS, J., dissenting).

does mean that he should not be disciplined for speaking frankly in a school assembly if he had no reason to anticipate punitive consequences.

One might conclude that respondent should have known that he would be punished for giving this speech on three quite different theories: (1) It violated the "Disruptive Conduct" rule published in the student handbook; (2) he was specifically warned by his teachers; or (3) the impropriety is so obvious that no specific notice was required. I discuss each theory in turn.

*The Disciplinary Rule*

At the time the discipline was imposed, as well as in its defense of this lawsuit, the school took the position that respondent violated the following published rule:

> "'In addition to the criminal acts defined above, the commission of, or participation in certain noncriminal activities or acts may lead to disciplinary action. Generally, these are acts which disrupt and interfere with the educational process.
>
> .          .          .          .          .
>
> "'*Disruptive Conduct.* Conduct which materially and substantially interferes with the educational process is prohibited, including the use of obscene, profane language or gestures.'" 755 F. 2d 1356, 1357, n. 1 (CA9 1985).

Based on the findings of fact made by the District Court, the Court of Appeals concluded that the evidence did not show "that the speech had a materially disruptive effect on the educational process." *Id.*, at 1361. The Court of Appeals explained the basis for this conclusion:

> "[T]he record now before us yields no evidence that Fraser's use of a sexual innuendo in his speech materially interfered with activities at Bethel High School. While the students' reaction to Fraser's speech may fairly be characterized as boisterous, it was hardly dis-

ruptive of the educational process. In the words of Mr. McCutcheon, the school counselor whose testimony the District relies upon, the reaction of the student body 'was not atypical to a high school auditorium assembly.' In our view, a noisy response to the speech and sexually suggestive movements by three students in a crowd of 600 fail to rise to the level of a material interference with the educational process that justifies impinging upon Fraser's First Amendment right to express himself freely.

"We find it significant that although four teachers delivered written statements to an assistant principal commenting on Fraser's speech, none of them suggested that the speech disrupted the assembly or otherwise interfered with school activities. *See,* Finding of Fact No. 8. Nor can a finding of material disruption be based upon the evidence that the speech proved to be a lively topic of conversation among students the following day." *Id.,* at 1360–1361.

Thus, the evidence in the record, as interpreted by the District Court and the Court of Appeals, makes it perfectly clear that respondent's speech was not "conduct" prohibited by the disciplinary rule.[4]  Indeed, even if the language of the rule could be stretched to encompass the nondisruptive use of obscene or profane language, there is no such language in respondent's speech.  What the speech does contain is a sexual metaphor that may unquestionably be offensive to some listeners in some settings.  But if an impartial judge puts his

---

[4] The Court's reliance on the school's authority to prohibit "unanticipated conduct disruptive of the educational process," *ante,* at 686, is misplaced.  The findings of the District Court, which were upheld by the Court of Appeals, established that the speech was not "disruptive."  Departing from our normal practice concerning factual findings, the Court's decision rests on "utterly unproven, subjective impressions of some hypothetical students." *Bender* v. *Williamsport Area School Dist.,* 475 U. S., at 553 (BURGER, C. J., dissenting).

or her own views about the metaphor to one side, I simply cannot understand how he or she could conclude that it is embraced by the above-quoted rule. At best, the rule is sufficiently ambiguous that without a further explanation or construction it could not advise the reader of the student handbook that the speech would be forbidden.[5]

### The Specific Warning by the Teachers

Respondent read his speech to three different teachers before he gave it. Mrs. Irene Hicks told him that she thought the speech "was inappropriate and that he probably should not deliver it." App. 30. Steven DeHart told respondent "that this would indeed cause problems in that it would raise eyebrows." *Id.*, at 61. The third teacher, Shawn Madden, did not testify. None of the three suggested that the speech might violate a school rule. *Id.*, at 49–50.

The fact that respondent reviewed the text of his speech with three different teachers before he gave it does indicate that he must have been aware of the possibility that it would provoke an adverse reaction, but the teachers' responses certainly did not give him any better notice of the likelihood of discipline than did the student handbook itself. In my opinion, therefore, the most difficult question is whether the speech was so obviously offensive that an intelligent high school student must be presumed to have realized that he would be punished for giving it.

---

[5] The school's disruptive conduct rule is entirely concerned with "the educational process." It does not expressly refer to extracurricular activities in general, or to student political campaigns or student debates. In contrast, "[i]n our Nation's legislative halls, where some of the most vigorous political debates in our society are carried on, there are rules prohibiting the use of expressions offensive to other participants in the debate." See *ante*, at 681. If a written rule is needed to forewarn a United States Senator that the use of offensive speech may give rise to discipline, a high school student should be entitled to an equally unambiguous warning. Unlike the Manual of Parliamentary Practice drafted by Thomas Jefferson, this School District's rules of conduct contain no unequivocal prohibition against the use of "impertinent" speech or "indecent language."

*Obvious Impropriety*

Justice Sutherland taught us that a "nuisance may be merely a right thing in the wrong place, — like a pig in the parlor instead of the barnyard." *Euclid* v. *Ambler Realty Co.*, 272 U. S. 365, 388 (1926). Vulgar language, like vulgar animals, may be acceptable in some contexts and intolerable in others. See *FCC* v. *Pacifica Foundation*, 438 U. S. 726, 750 (1978). Indeed, even ordinary, inoffensive speech may be wholly unacceptable in some settings. See *Schenck* v. *United States*, 249 U. S. 47, 52 (1919); *Pacifica, supra,* at 744–745.

It seems fairly obvious that respondent's speech would be inappropriate in certain classroom and formal social settings. On the other hand, in a locker room or perhaps in a school corridor the metaphor in the speech might be regarded as rather routine comment. If this be true, and if respondent's audience consisted almost entirely of young people with whom he conversed on a daily basis, can we—at this distance—confidently assert that he must have known that the school administration would punish him for delivering it?

For three reasons, I think not. First, it seems highly unlikely that he would have decided to deliver the speech if he had known that it would result in his suspension and disqualification from delivering the school commencement address. Second, I believe a strong presumption in favor of free expression should apply whenever an issue of this kind is arguable. Third, because the Court has adopted the policy of applying contemporary community standards in evaluating expression with sexual connotations, this Court should defer to the views of the district and circuit judges who are in a much better position to evaluate this speech than we are.

I would affirm the judgment of the Court of Appeals.