936 F.Supp. 676 (1996)
Cecilia LACKS, Plaintiff,
v.
FERGUSON REORGANIZED SCHOOL DISTRICT, R-2, Defendant.
No. 4:95CV1024 CDP.
United States District Court, E.D. Missouri, Eastern Division.
August 15, 1996.
*677 Charles A. Werner, Schuchat and Cook, St. Louis, MO, Lisa S. Van Amburg, Partner, Van Amburg and Chackes, St. Louis, MO, for plaintiff.
Todd J. Aschbacher, Frank Susman, Susman and Schermer, Clayton, MO, for Ferguson Reorganized School District R-2.

MEMORANDUM AND ORDER
PERRY, District Judge.
This matter is before the Court on Count I of plaintiff's complaint, which seeks judicial review of the school board's March 23, 1995 decision to terminate plaintiff's indefinite teaching contract. Also before the Court is *678 defendant's motion for partial summary judgment as to Count III of plaintiff's first amended complaint.
Defendant Ferguson Reorganized School District, R-2 ("the district") terminated plaintiff Cecilia Lacks from her position as a tenured school teacher because she allowed her students to use profanity in the poems and plays they wrote for her English class, which defendant found violated a district rule prohibiting student profanity. In her first amended complaint, plaintiff seeks judicial review of the school board's termination decision under Missouri law, Mo.Rev.Stat. § 168.120 (Count I), alleges that defendant violated the Due Process Clause (Count II) and First Amendment (Count III) to both the United States and Missouri constitutions, and alleges that defendant discriminated against her based on race under both federal and Missouri law (Counts IV and V). By order dated March 14, 1996, this Court dismissed plaintiff's due process claims (Count II), and pursuant to that order also dismissed the two individual defendants. Therefore, the sole remaining defendant is the district. In its March 14, 1996 order, the Court also denied defendant's motion to dismiss plaintiff's First Amendment claims. The remaining claims in this case, other than plaintiff's request for judicial review of the board's decision, are set for jury trial on November 4, 1996.

I. Factual Background
Plaintiff Lacks had an indefinite teaching contract with defendant school district, where she had taught since 1972. Plaintiff had been teaching at Berkeley Senior High School since 1992. During the 1994-95 school year (until she was terminated in March of 1995), plaintiff taught English and journalism at Berkeley. In addition, as part of her journalism class, plaintiff sponsored the school newspaper, which had not been published for several years before she revived it in 1993.
Plaintiff selected a curriculum for her English class in the fall of 1994 that included viewing, reading and writing drama. From September 28 to October 10, 1994, the students worked on a drama writing assignment in which the class was divided into six small groups, and each group had to write and perform a short play. On or about October 10, 1994, the students performed their plays and were videotaped by a district employee. The plays written and performed by the students contained extensive profanity, including frequent use by the students of the words "nigger," "fuck," "bitch," "ass," and "shit." Plaintiff had reviewed the students' scripts before the plays were produced, and also viewed the videotapes of the plays with the students in class. Plaintiff did not encourage or discourage the use of profanity by her students in the drama assignment or any other creative-writing assignment, nor did she generally discuss the use of profanity in the plays or other creative works with her students after the fact.
Plaintiff's contract for employment, which she signed prior to the 1994-95 school year, stated that she "had received and read the rules and regulations and the statement of policies of the Board of Education ..." The district's 1994-95 policies and procedures contained a student discipline policy (board policy number 3043) that incorporated the "student discipline code" ("the code"). The code prohibits certain student behavior, both Type I (more severe) and Type II (less severe). Under the code, "Type II Behavior includes ... profanity ... and any other inappropriate behavior as defined by school officials." At all relevant times, plaintiff's classroom contained signs that prohibited profanity. Outside of class-related creative activities, plaintiff did not tolerate the use of profanity or other disruptions by her students.
Plaintiff did not censor student profanity in the students' plays and poems because of her teaching approach, referred to as the "student-centered method," in which teachers do not censor the creative expressions of their students so that the students can find their own voice and have that voice accepted as is before it is ultimately refined. The student-centered method used by plaintiff is nationally accepted and plaintiff herself was successful with the method. During her career, plaintiff was praised by administrators and teachers inside and outside of the district for her success as a teacher. There are alternative methods of teaching creative writing *679 that do not allow students to use profanity and that are successful. Plaintiff is familiar with some of these methods and has briefly experimented with them, but has never used them for an entire semester.
On or about January 10, 1995, Vernon Mitchell, principal at Berkeley, learned about the videotapes of the plays performed by plaintiff's students in October 1994. Mitchell, along with Barbara Davis, the district's Assistant Superintendent of Curriculum Instruction, and Dr. John Wright, the district's Assistant Superintendent for Personnel, immediately viewed some of the plays. Plaintiff met with the administration on January 25, 1995, and explained her method of teaching in general and the drama assignment in particular.
On January 27, 1995, Dr. Robert Fritz, the district's Superintendent of Schools, formally charged plaintiff with willful or persistent violation of the published regulations of the Board of Education. Dr. Fritz alleged that plaintiff had violated numerous board policies and recommended that the board terminate plaintiff's indefinite teaching contract. Plaintiff made a timely request for a hearing by the school board, and a hearing was held on March 1, 2, 6, 7 and 9, 1995. At the hearing, defendant narrowed its charges to one: violation of board policy 3043 prohibiting student profanity. Defendant relied on the videotapes of the six plays and on two poems written by one of plaintiff's students, each of which contained extensive profanity. On March 23, 1995, the school board issued its Findings of Fact and Conclusions of Law, signed by Board President Leslie S. Hogshead, by which it terminated plaintiff's indefinite teaching contract effective that same day. The Board concluded that the plays and poems contained "extreme profanity" and that plaintiff's "conduct relative to [those plays and poems] and to similarly permitted and admitted prior teaching assignments of Teacher violated Board policy 3043, in a willful or persistent manner."

II. Judicial Review of Board Decision (Count I)

A. Standard of Judicial Review
Under Missouri law, the board of education of a school district can terminate an indefinite contract with a permanent teacher for six statutory reasons, including willful or persistent violation of a board regulation. Mo.Rev.Stat. § 168.114(1). Terminated teachers can appeal the decision of the board to the circuit court of the county where the employing district is located, and such appeals "shall be heard as provided in chapter 536, RSMo." Id. § 168.120. Under chapter 536, which governs administrative procedure and review, courts may overturn a school board's decision if the decision:
(1) Is in violation of constitutional provisions;
(2) Is in excess of the statutory authority or jurisdiction of the agency;
(3) Is unsupported by competent and substantial evidence upon the whole record;
(4) Is, for any other reason, unauthorized by law;
(5) Is made upon unlawful procedure or without a fair trial;
(6) Is arbitrary, capricious or unreasonable;
(7) Involves an abuse of discretion.
Id. § 536.140(2). Plaintiff filed a timely appeal of the board's decision with the Circuit Court of St. Louis County, and defendant removed the case to this court. The Court has supplemental jurisdiction over this state-law claim under 28 U.S.C. § 1367, and must apply Missouri law in reviewing the board's decision. See, e.g., Carrington v. Mahan, 51 F.3d 106, 107 (8th Cir.1995).
Plaintiff challenges the school board's decision to terminate her contract on four grounds: (1) the evidence does not support the board's finding of plaintiff's willful and persistent violation of board policy 3043 because the policy does not apply to creative works and because there is no evidence of willfulness or persistence; (2) the board's decision was arbitrary, capricious and unreasonable in that the board failed to follow its own policies governing academic freedom and student publications; (3) the board's decision is unauthorized by law and made pursuant to *680 unlawful procedures in that defendant has attempted to disguise an incompetency allegation as a violation of board policy, and defendant did not follow the heightened procedural requirements of a termination for incompetency; and (4) plaintiff did not receive a fair hearing under Missouri law because defendant did not allow her to depose two individuals and did not allow all of her witnesses to testify at the hearing. Because the board's decision that plaintiff "willfully or persistently" violated board policy 3043 is unsupported by competent and substantial evidence upon the whole record, the decision of the board will be reversed and the Court will not examine plaintiff's alternative arguments.

B. Discussion
In its decision, the board stated that plaintiff was terminated because "[t]he Board has clearly established a prohibition of profanity by students in policy number 3043; this is the policy under which Teacher has been charged and which Teacher has willfully or persistently violated." Missouri law allows school districts to terminate the contracts of tenured teachers based on "[w]illful or persistent violation of, or failure to obey, the ... published regulations of the board of education of the school district employing [her]." Mo.Rev.Stat. § 168.114(1)(4). In reviewing the evidence as to whether plaintiff's actions were willful or persistent, this Court must afford appropriate weight to the board's evidentiary findings:
[T]he evidence must be considered in the light most favorable to the board's decision, together with all reasonable inferences where supported. If evidence before an administrative body would warrant either of two opposed findings, the reviewing court is bound by the administrative determination and it is irrelevant that there is evidence to support a contrary finding. Finally, the determination of the credibility of witnesses is a function of the administrative tribunal.
Hudson v. Wellston Sch. Dist., 796 S.W.2d 31, 33 (Mo.Ct.App.1990) (citations omitted).
Several Missouri courts have addressed the meaning of "willful" and "persistent" as used in § 168.114(1)(4). The Supreme Court of Missouri has stated:
"Willful" has been defined as "done deliberately; not accidental or without purpose; intentional" and "persistent" as "continuing in a course of action without regard to opposition."
Board of Educ., Mt. Vernon Schools v. Shank, 542 S.W.2d 779, 782 (Mo.1976) (en banc). Other Missouri courts have examined the degree of intent required under § 168.114(1)(4):
Is it enough ... that the offender intends to act, and the action taken happens to be inconsistent with a regulation, or must he or she act with the intention of violating or failing to obey a regulation? The first of these interpretations merely involves one intention, viz. to act in the absence of reflex or coercion; the second involves two intentions, viz. one to act and one to violate or disobey. We believe the latter interpretation provides the meaning intended by the legislature.
Carter County Sch. Dist., R-1 v. Palmer, 582 S.W.2d 347, 349 (Mo.Ct.App.1979); see also Burgess v. Ferguson Reorganized Sch. Dist., R-2, 820 S.W.2d 651, 656 (Mo.Ct.App.1991). Therefore, to support a finding that a teacher violated § 168.114(4), Missouri courts require school districts to establish (1) an intent to act and (2) an intent to violate or disobey a particular regulation. Ortbals v. Special Sch. Dist. of St. Louis County, 762 S.W.2d 437, 440 (Mo.Ct.App.1988).
In this case, defendant established the "intent to act" element because plaintiff admitted that she does not censor profanity in her students' creative works. The issue, therefore, is whether plaintiff had an "intent to violate or disobey a particular regulation," i.e., board policy 3043. The board made no specific finding as to plaintiff's intent to violate policy 3043, but presumed such intent because plaintiff was aware that policy 3043 incorporated the student discipline code that prohibited student profanity. Plaintiff argues, however, that she did not know that policy 3043 applied to profanity in class-related creative assignments. Defendant argues that there is no exception for class-related profanity on the face of policy 3043. Defendant *681 also argues that plaintiff had been put on notice that the policy applied to creative works by Principal Mitchell's warnings to plaintiff regarding profanity in the student newspaper. Plaintiff denies having received any warnings about profanity in the newspaper.
The record as a whole clearly indicates that there was in practice an unwritten exception in the district for profanity in class-related activities. The evidence presented to the board was overwhelming that many administrators and teachers in the district allowed class-related profanity depending on the context and degree of profanity. The relevant evidence can be summarized as follows:
 In the 1993/94 school year, plaintiff showed Mitchell a student journal entry containing the words "honkey" and "chink," and the statement if "I ever see a white are [sic] a Jew touch me I'm going two kill them ..." and Mitchell did not discuss the language with plaintiff or the student, nor did he discipline either plaintiff or the student. (Tr. 202).
 A play written and performed by Berkeley students for the entire student body and attended by Mitchell contained profanity, including at least the word "damn," as well as other conduct classified as Type II violations of policy 3043. (Tr. 209-12). Neither the teacher supervising that play nor the students performing it were disciplined in any way. (Tr. 214-16).
 Dr. John Wright, assistant superintendent, testified regarding the plays produced in plaintiff's class that "if [the students] were not doing this in a play, they would have been suspended, it would have been Type I or Type II behavior in the classroom." (Tr. 116).
 Wright testified that he did not know whether a student who reads profanity aloud from another author's work could be punished. (Tr. 100).
 Karen Price, Chair of the English Department at Berkeley, testified that she was not aware of a rule that required teachers to censor profanity in creative works. (Tr. 813). Price also testified that she was not aware that a student reading profanity from literature could be charged with violating the student discipline code. (Tr. 823).
 Dr. Larilyn Lawrence, the district's Curriculum Coordinator for Language Arts, testified that she did not know of a policy prohibiting students from reading profanity in literature aloud. (Tr. 845).
 Delores Graham, principal at a middle school in the district, was not aware that a student reading profanity from a creative work of literature or that student's teacher would be violating the student discipline code. (Tr. 892).
 James Nicholson, a playwright who visited plaintiff's classes, testified that he was present when district administrators heard students read profanity from their own creative works, but no administrator ever told him or plaintiff to disallow profanity in the students' creative expression. Nicholson testified that no policy was "verbalized to me or given to me in print." (Tr. 318).
 C.S., a former student of plaintiff, testified as follows: "I didn't realize that expressing yourself in a play when, you know, I didn't realize if you express yourself, you could get in trouble for that. But I realize that if you are using profanity and doing other things in the hallway or any place else in the school, that you could get in trouble." (Tr. 852).
 P.S., a former student of plaintiff, testified that she performed creative writing assignments containing profanity in the presence of a district administrator and the administrator "didn't give a reaction, so we just basically, we went with the flow." (Tr. 510).
Defendant submitted no evidence indicating that the district in fact enforced policy 3043 to prohibit students from reading aloud or otherwise using profanity in creative works.[1] The only evidence that a district *682 employee interpreted policy 3043 as defendant has interpreted it even after plaintiff's termination was the testimony of Barbara Davis, assistant superintendent. Davis testified that it would not be acceptable for a student to read aloud from a book or play that contained profanity, and that such behavior by a student "could be" a violation of the student discipline code. (Tr. 785-87). Further, when asked how teachers were to know that having student read profanity in creative works aloud could get them terminated, Davis testified that "teachers use judgment on that." (Tr. 791-92). When asked whether teachers in the district know they can be terminated for reading a play with profanity aloud in their classroom, Davis responded "I'm sure they do now." (Tr. 797). Davis' interpretation of policy 3043, which contradicts evidence from every other administrator or teacher who testified at the hearing, is not sufficient to prove that plaintiff or anyone else actually knew that policy 3043 prohibited extreme profanity by students in creative works.
Rather, as the foregoing evidence demonstrates, there was no agreement or understanding within the district regarding how the use of profanity by students both in reading literature aloud and in the students' own creative expressions would be treated under the student discipline code.[2] Davis said reading aloud literature containing profanity could violate the code; Lawrence, Price and Graham said that it would not. Students did not know that reading profanity  whether profanity written by other authors or by students  could lead to discipline, and students did in fact read profanity aloud in front of administrators of the district and were not disciplined. The students who performed the plays in plaintiff's class were not disciplined, according to one administrator, specifically because the profanities were part of a play. Price and Lawrence, who were called on by the administration to offer written statements regarding the videotapes, testified that they did not believe that a teacher who allows profanity in creative writing violates the student discipline code.

C. Conclusion
The board has apparently attempted to draw the line at the extreme use of student profanity. In the "Conclusions of Law" section of the board's decision, the board states that "District Exhibits 10, 11, 12 and 13 contain extreme profanity." (Emphasis added). In addition, the board stated in the "Conclusions of Law" section that "Teacher's conduct within the District was an isolated, willful and persistent practice violative of Board policy to a degree that cannot be, will not be and otherwise has not been tolerated." (Emphasis added). On the other hand, neither teacher nor student were punished for the statement "I'll blow your damn head off" in a student play, for using racial and ethnic slurs in a student journal, or for a student's use of the word "damn" in a prize-winning poem.
It may be the board's desire to draw lines with respect to student profanity, and the Court agrees that the board has the authority to establish and interpret its own policies. State ex rel. City of Springfield v. Public Serv. Comm'n, 812 S.W.2d 827, 833 (Mo.Ct. App.1991). However, the board never drew these lines in board policy 3043, until it chose to terminate plaintiff for violating the policy. On its face, policy 3043  contained in the student behavioral code  prohibits student profanity and other disruptive behavior. On *683 its face the policy refers to student behavior, not to a student's performance of a play, or to a student's reading aloud another's writing, or to a student's own written work produced as part of a class assignment. The evidence overwhelmingly shows that in practice, student profanity in creative expression was allowed to a certain degree. The board could only have concluded that plaintiff intended to violate policy 3043 if it concluded that plaintiff knew that the policy prohibited student use of profanity in creative works. This conclusion that plaintiff (or anyone else in the district) interpreted policy 3043 as the board has interpreted it  to allow some profanity but not extreme profanity in creative works  is simply not supported by the evidence presented to the board. Accordingly, defendant did not establish that plaintiff "willfully or persistently" violated board policy 3043. For that reason, the board's decision must be reversed.

D. Relief
Missouri law provides that, if a court finds for the teacher on appeal, the teacher "shall be restored to permanent teacher status and shall receive compensation for the period during which he may have been suspended from work, and such other relief as may be granted by the court." Mo.Rev.Stat. § 168.120(4). In addition to the statutory relief, plaintiff also seeks attorneys' fees and costs, and expungement of any reference to her termination from plaintiff's record. As required by Missouri law, the Court will order defendant immediately to reinstate plaintiff to her position as a teacher with an indefinite teaching contract and to compensate plaintiff from the date she was suspended by the district through the date of her reinstatement. Mo.Rev.Stat. § 168.120(4). In addition, the Court finds it appropriate to order defendant to expunge all references to plaintiff's termination and to these proceedings from plaintiff's personnel file. Finally, the Court will award plaintiff reasonable attorney's fees and costs related only to her appeal of the board's decision, i.e., Count I of plaintiff's complaint.

III. Collateral Estoppel
During this litigation, the parties have raised the issue of collateral estoppel (also known as issue preclusion) with respect to the effect of the board's decision on plaintiff's remaining legal claims for relief, which are set for jury trial in November 1996. The Missouri law of issue preclusion governs this case. Simmons v. O'Brien, 77 F.3d 1093, 1096 (8th Cir.1996). Under Missouri law, courts consider the following factors to determine whether collateral estoppel applies: (1) is the issue in the present case identical to the issue decided in the prior adjudication; (2) was there a judgment on the merits in the prior adjudication; (3) is the party against whom collateral estoppel asserted the same party or in privity with a party in the prior adjudication; and (4) did the party against whom collateral estoppel is asserted have a full and fair opportunity to litigate the issue prior to the suit. King General Contractors, Inc. v. Reorganized Church of Jesus Christ of Latter Day Saints, 821 S.W.2d 495, 500 (Mo.1991) (en banc).
Because there is no longer a prior "judgment on the merits" under the second factor, collateral estoppel does not apply in this case: "When an appellate court vacates a judgment, the lower court's judgment cannot be considered a final judgment on the merits for purposes of collateral estoppel." State v. Nunley, 923 S.W.2d 911, 922 (Mo. 1996) (en banc). In this order, the Court reverses the decision of the school board; therefore, there is no final judgment on the merits for purposes of collateral estoppel. Furthermore, with respect to the timing of this Court's ruling on Count I, the Court notes that Lytle v. Household Mfg., Inc., 494 U.S. 545, 110 S.Ct. 1331, 108 L.Ed.2d 504 (1990), holding that a district court should not make factual determinations that are common to equitable and legal claims before the legal claims are heard by a jury, does not apply in this case because the Court did not make any factual determinations in ruling on Count I of plaintiff's complaint. Rather, the Court held only that the board's decision was not supported by competent evidence. Accordingly, collateral estoppel does not apply in this case and the jury deciding plaintiff's *684 remaining claims will not be bound by any prior decision in this case, either by the school board or by this Court.

IV. Motion for Summary Judgment (Count III)
Defendant filed a motion for partial summary judgment on Count III of plaintiff's complaint, in which plaintiff alleges that defendant violated her rights under the First Amendment. In its motion, defendant essentially argues that the Supreme Court has concluded, as a matter of law, that schools can prohibit profanity. Plaintiff argues that there is no per se rule allowing schools to prohibit any and all profanity; rather, the Court must apply the "legitimate pedagogical concerns" test in this case.
The Court disagrees with defendant's contention that the Supreme Court has concluded that schools can prohibit profanity regardless of the circumstances. The two most relevant Supreme Court cases upholding a school's right to prohibit profanity, Hazelwood Sch. Dist. v. Kuhlmeier, 484 U.S. 260, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988) and Bethel Sch. Dist. No. 403 v. Fraser, 478 U.S. 675, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986), are distinguishable from the present case. In Hazelwood, the Court upheld the school's right to prohibit profanity in a student newspaper. In Bethel, the Court upheld the school's right to discipline a student for making a lewd and offensive speech in front of 600 students in the context of a fellow student's campaign for an elected class office.
First, these cases are distinguishable from the present case because they both involved public dissemination of profanity. The Court in Bethel noted: "Surely it is a highly appropriate function of public school education to prohibit the use of vulgar and offensive terms in public discourse." Bethel, 478 U.S. at 683, 106 S.Ct. at 3164. In the present case, the evidence shows that the student profanity allowed by plaintiff was for in-class educational purposes only, and was specifically not to be disseminated outside of the classroom. Second, the Supreme Court cases are distinguishable from this case in that neither Hazelwood nor Bethel involved a teacher asserting her right to allow profanity that allegedly has a constructive educational purpose. The teacher's allegations in this case require a balance of the school's interest and the teacher's interest. Although the Court recognizes that schools have broad authority to prohibit student profanity, Hazelwood and Bethel do not require this Court to hold, as a matter of law, that defendant can prohibit profanity in its schools regardless of the context.
Rather, Hazelwood contains the appropriate legal standard to apply in this case: Was defendant's termination of plaintiff reasonably related to legitimate pedagogical concerns? Hazelwood, 484 U.S. at 273, 108 S.Ct. at 571. Application of this legal standard will inherently require the appropriate balance of the school's interest in prohibiting profanity and the teacher's interest in using the teaching method at issue in this case. In applying the "pedagogical concerns" test, it is appropriate to consider "among other things, the age and sophistication of the students, the relationship between teaching method and valid educational objective, and the context and manner of the presentation." Silano v. Sag Harbor Union Free Sch. Dist. Bd., 42 F.3d 719, 723 (2d Cir.1994), cert. denied, ___ U.S. ___, 115 S.Ct. 2612, 132 L.Ed.2d 856 (1995).
At trial, defendant must establish its pedagogical concerns relating to the prohibition of this particular profanity, and must also establish that the termination of plaintiff was an action reasonably related to these concerns. On the other hand, plaintiff must show that her termination was not reasonably related to legitimate pedagogical concerns. On all of these issues, many factual disputes remain. For example, the parties disagree as to the effectiveness of plaintiff's teaching method and as to the effectiveness of other teaching methods that do not allow profanity. Therefore, because genuine issues of material fact remain, defendant's motion for partial summary judgment on plaintiff's First Amendment claims will be denied.
There is a sub-element of plaintiff's First Amendment claim: whether defendant afforded plaintiff appropriate notice under the First Amendment that her actions were *685 prohibited. In its order denying defendant's motion to dismiss on this issue, the Court noted that two Supreme Court cases contained potentially conflicting standards with respect to notice. The Court now agrees with defendant and is convinced that the First Circuit has articulated the appropriate standard with respect to the notice required in the context of the First Amendment rights of high school teachers:
Indeed, this circuit has long recognized a teacher's right to notice of what classroom conduct is prohibited. Of course, while we acknowledge a First Amendment right of public school teachers to know what conduct is proscribed, we do not hold that a school must expressly prohibit every imaginable inappropriate conduct by teachers. The relevant inquiry is: based on existing regulations, policies, discussions, and other forms of communication between school administrators and teachers, was it reasonable for the school to expect the teacher to know that her conduct was prohibited?

Ward v. Hickey, 996 F.2d 448, 453-54 (1st Cir.1993) (citations omitted) (emphasis added). Under the foregoing standard, the Court has no doubt that several factual disputes remain in this case. For example, the parties dispute whether Mitchell warned plaintiff about profanity in the student newspaper, and, if he did, what effect those warnings had on plaintiff's understanding of board policy 3043 and its application to non-newspaper, class-related creative expression. These factual disputes preclude summary judgment, and defendant's motion for partial summary judgment as to the notice aspect of plaintiff's First Amendment claim will be denied.
Accordingly,
IT IS HEREBY ORDERED that, pursuant to plaintiff's request under Missouri law for judicial review of the school board's March 23, 1995 decision, the decision of the school board is reversed.
IT IS FURTHER ORDERED that defendant shall reinstate plaintiff to her position as a teacher with an indefinite teaching contract and shall compensate plaintiff from the date she was suspended by the district through the date of her reinstatement as required by Mo.Rev.Stat. § 168.120(4).
IT IS FURTHER ORDERED that defendant expunge all references to plaintiff's termination and to these proceedings from plaintiff's personnel file.
IT IS FURTHER ORDERED that plaintiff is awarded reasonable attorney's fees and costs related only to her appeal of the board's decision, i.e., Count I of plaintiff's complaint.
IT IS FURTHER ORDERED that defendant's motion for partial summary judgment [# 46] on Count III (First Amendment) of plaintiff's complaint is denied.
A Partial Judgment in accord with this order is entered this date.
NOTES
[1] Defendant attempts to characterize Mitchell's alleged warnings to plaintiff about profanity in the student newspaper as evidence that plaintiff knew profanity was not allowed in any student creative works. Defendant's attempt is unconvincing because there is a separate board policy (number 2053) entitled "student publications" that requires teachers and students to judge the "appropriateness" of materials and to edit "obscene" and other material from the student newspaper and yearbook. Mitchell's enforcement of this specific policy does not translate to an interpretation that profanity is not allowed in student poems and plays under policy 3043, which governs student behavior. In fact, policy 2053 begins with the following statement: "The Board recognizes creative student expression as an educational benefit of the school experience. One medium of expression is student journalism." The policy proceeds to expressly limit the content of student journalism, but does not address limitations on any other form of creative student expression.
[2] Although the Court notes that plaintiff was not charged with allowing students to read other authors' works aloud, it is relevant to the fact that the district drew lines in practice that were not expressly drawn in policy 3043.