**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

ALAN NEWSOM, a minor by and
through FRED NEWSOM, his Parent
and Next Friend,
              *Plaintiff-Appellant,*

        v.

ALBEMARLE COUNTY SCHOOL BOARD,
by and through its School Board
Members in their Official Capacity;
CHARLES M. WARD, Albemarle
School Board Member, in his
Official Capacity; PAM MOYNIHAN,
Albemarle School Board Member,
in her Official Capacity; GORDON
WALKER, Albemarle County School
Board Member, in his Official
Capacity; KEN C. BOYD, Albemarle
School Board Member, in his
Official Capacity; STEPHEN H.
KOLESZAR, Albemarle School Board
Member, in his Official Capacity;
DIANTHA H. MCKEEL, Albemarle
School Board Member, in her
Official Capacity; GARY GRANT,
Albemarle School Board Member,
in his Official Capacity; BETTY PITT,
both in her Individual Capacity and
in her Official Capacity as Vice
Principal of Jack Jouett Middle
School; RUSSELL L. JARRETT, in his
Official Capacity as Principal of

No. 03-1125

Jack Jouett Middle School; KEVIN
CASTNER, in his Official Capacity as
Division Superintendent of the
Albemarle County Public School
System,
                    *Defendants-Appellees.*

SOUTHERN LEGAL RESOURCE CENTER,
INCORPORATED; INDEPENDENCE
INSTITUTE; FIRST AMENDMENT
LAWYERS ASSOCIATION; INDIVIDUAL
RIGHTS FOUNDATION; RICHMOND
AMERICAN CIVIL LIBERTIES UNION OF
VIRGINIA; COMMONWEALTH OF
VIRGINIA,
            *Amici Supporting Appellant.*

NATIONAL SCHOOL BOARDS
ASSOCIATION; VIRGINIA SCHOOL
BOARDS ASSOCIATION; NORTH
CAROLINA SCHOOL BOARDS
ASSOCIATION; MARYLAND SCHOOL
BOARDS ASSOCIATION; SOUTH
CAROLINA SCHOOL BOARDS
ASSOCIATION,
            *Amici Supporting Appellees.*

Appeal from the United States District Court
for the Western District of Virginia, at Charlottesville.
Norman K. Moon, District Judge.
(CA-02-101-3)

Argued: September 25, 2003

Decided: December 1, 2003

Before WILLIAMS and SHEDD, Circuit Judges, and
HAMILTON, Senior Circuit Judge.

Vacated and remanded with instructions by published opinion. Senior Judge Hamilton wrote the opinion, in which Judge Williams and Judge Shedd joined.

---

**COUNSEL**

**ARGUED:** Daniel Mark Zavadil, NATIONAL RIFLE ASSOCIATION OF AMERICA, Fairfax, Virginia, for Appellant. Mary Ellen McGowan, SICILIANO, ELLIS, DYER & BOCCAROSSE, Fairfax, Virginia, for Appellees. **ON BRIEF:** Kirk D. Lyons, SOUTHERN LEGAL RESOURCE CENTER, INC., Black Mountain, North Carolina, for Amicus Curiae Center. David B. Kopel, INDEPENDENCE INSTITUTE, Golden, Colorado, for Amicus Curiae Institute. Bradley J. Shafer, SHAFER & ASSOCIATES, P.C., Lansing, Michigan, for Amicus Curiae Lawyers Association. James H. Warner, INDIVIDUAL RIGHTS FOUNDATION, Rohrersville, Maryland; Manuel S. Klausner, INDIVIDUAL RIGHTS FOUNDATION, Los Angeles, California, for Amicus Curiae Foundation. Rebecca K. Glenberg, AMERICAN CIVIL LIBERTIES UNION OF VIRGINIA FOUNDATION, INC., Richmond, Virginia, for Amicus Curiae ACLU. Jerry W. Kilgore, Attorney General, William H. Hurd, Solicitor, Maureen R. Matsen, Deputy State Solicitor, William E. Thro, Deputy State Solicitor, OFFICE OF THE ATTORNEY GENERAL, Richmond, Virginia, for Amicus Curiae Commonwealth. D. Patrick Lacy, Jr., Kelly C. Horan, REED SMITH, L.L.P., Richmond, Virginia; Julie K. Underwood, NATIONAL SCHOOL BOARDS ASSOCIATION, Alexandria, Virginia, for Amici Curiae School Boards Associations.

---

**OPINION**

HAMILTON, Senior Circuit Judge:

In this First Amendment case, Alan Newsom (Newsom), a student at Jack Jouett Middle School (Jouett) in Albemarle County, Virginia, by and through his parent and next friend, Fred Newsom, appeals from a district court order denying his motion for a preliminary injunction seeking to enjoin the enforcement of the portion of Jouett's

2002-2003 dress code which prohibits "messages on clothing, jewelry, and personal belongings that relate to . . . weapons." According to Newsom, the district court should have entered a preliminary injunction because he satisfied the test governing preliminary injunctions with regard to his claims that the challenged portion of Jouett's 2002-2003 dress code is both unconstitutionally overbroad and vague. Because we agree that Newsom satisfied this test at the preliminary injunction stage of the proceedings, we vacate the district court's order denying Newsom's motion for a preliminary injunction and remand with instructions to enter a preliminary injunction.

I

A

Students at Jouett and their parents are provided each year with a student/parent handbook that is updated every summer. During the 2001-2002 school year, the student/parent handbook prohibited students from wearing, *inter alia*, "messages on clothing, jewelry, and personal belongings that relate to drugs, alcohol, tobacco, sex, vulgarity, or that reflect adversely upon persons because of their race or ethnic group."

On April 29, 2002, during the student lunch period at Jouett, Elizabeth Pitt (Pitt), an assistant principal at Jouett, observed Newsom, who at the time was a twelve-year-old student in the sixth grade at Jouett, sitting at a table on the opposite side of the cafeteria with his back towards her.[1] Pitt's attention was drawn to Newsom by his purple t-shirt, which depicted three black silhouettes of men holding firearms superimposed on the letters "NRA" positioned above the phrase "SHOOTING SPORTS CAMP." Although the men appear to be aiming their firearms, the t-shirt did not indicate what or whom their targets may be. The front of the t-shirt bore a smaller but identical version of the men superimposed on the initials "NRA," but no other writing or symbols.

---

[1]During the times relevant to this litigation, over 500 students were enrolled in the sixth, seventh, and eighth grades at Jouett.

According to Pitt, she had the immediate impression that the figures were "sharpshooters" which reminded her of the shootings at Columbine High School in Colorado and other incidents of school-related violence. As a consequence of her impression, Pitt was immediately concerned over the appropriateness of Newsom's t-shirt in a middle school environment. Pitt believed that the t-shirt had the potential to disrupt the instructional process since the graphics on the shirt were so large and bold as to be distracting and she feared that Newsom's fellow middle school students would also associate the images with the events at Columbine High School and other incidents of school-related violence. It was Pitt's judgment that the images on Newsom's t-shirt could also reasonably be interpreted by other middle school students to promote the use of guns. Pitt felt that the imagery on the t-shirt was at odds with her obligation as a school administrator to discourage and prevent gun-related violence since the images on Newsom's t-shirt conflicted with the message that "Guns and Schools Don't Mix" and had the potential to create confusion among middle school students over the appropriate boundaries between firearms and schools. Pitt was also aware of at least one prior incident at Jouett when a middle school student brought a firearm to a school function.

After observing the images on the t-shirt, Pitt approached Newsom and whispered in his ear that he needed to do something about the t-shirt because it was not appropriate school attire. When Pitt suggested that Newsom either change the t-shirt or turn it inside out, Newsom told her that he had obtained the t-shirt at a camp and asked what was wrong with it. Pitt advised Newsom that his shirt was inappropriate for school because the shirt depicted "pictures of men shooting guns."

According to Pitt, she further explained the inappropriateness of the t-shirt to Newsom in terms she felt he would understand, that the school did not allow alcohol or drugs in the school and did not permit clothing with references to alcohol or drugs. Similarly, the school did not allow weapons in school nor images of such weapons on student clothing.

After Newsom asked Pitt if she was going to suspend him, Pitt advised Newsom, whom she had always found to be an obedient and cooperative student, that suspension was not going to happen in this

situation because he simply needed to change his t-shirt. When New-
som then asked, "What if I refuse?," Pitt told him that if he refused
to comply with her request it would raise an entirely different issue,
*i.e.*, defiance, in which case an in-school suspension could be a possi-
bility. Pitt cautioned Newsom, however, that there was no need to
take the matter that far since his behavior had never been a problem
before and all he had to do was either turn the t-shirt inside out or
change it. Newsom appeared to agree with Pitt and left the cafeteria
to go to the boys' bathroom to turn his t-shirt inside out.

During the summer of 2002, the student/parent handbook was
revised to prohibit students from wearing, *inter alia*, "messages on
clothing, jewelry, and personal belongings that relate to drugs, alco-
hol, tobacco, weapons, violence, sex, vulgarity, or that reflect
adversely upon persons because of their race or ethnic group."[2]

For the 2002-2003 school year, Newsom was in the seventh grade
at Jouett. Between the beginning of the school year and October 2,
2002 (when the district court heard oral argument on Newsom's
motion for a preliminary injunction), Pitt observed Newsom on at
least three occasions wearing a t-shirt in school that bore the initials
"NRA", an NRA logo, or other written messages referencing the
NRA. According to Pitt, none of those t-shirts contained the objec-
tionable images of gunmen that were on the t-shirt Newsom wore to
school on April 29, 2002. School authorities did not speak to Newsom
nor take any measures to prohibit him from wearing the other NRA
t-shirts and he continued to do so through the date of the hearing on
the preliminary injunction.

B

On September 17, 2002, Newsom filed suit against the Albemarle
County School Board and a host of other school officials (including
Pitt) in the United States District Court for the Western District of
Virginia, alleging that his First Amendment rights to freedom of
speech and association had been infringed.[3] In his complaint, New-

---

[2]For ease of reference, we will refer to this provision as the 2002-2003
Jouett Dress Code.

[3]For ease of reference, we will refer to the defendants as Jouett.

som alleged, *inter alia*, that: (1) his First Amendment rights were violated when he was instructed to change his t-shirt or turn it inside out in April 2002; (2) his due process rights were violated because the 2001-2002 dress code did not give him notice that wearing his t-shirt would subject him to disciplinary action; and (3) the 2002-2003 Jouett Dress Code both was unconstitutionally overbroad and vague. Along with his complaint, Newsom filed a motion for a preliminary injunction seeking to enjoin the enforcement of the 2002-2003 Jouett Dress Code to the extent that it prohibited "the wearing of clothing or jewelry that depicts images of or messages containing weapons or firearms images that are being used and/or contained in a lawful, non-violent, non-threatening display of speech, expression, or association." According to Newsom, such an injunction would not only allow him to wear the t-shirt he was banned from wearing, but also allow him to wear other t-shirts containing messages related to the lawful possession of firearms.

The district court held a hearing on the motion for preliminary injunction on October 2, 2002. On December 20, 2002, the district court filed a memorandum opinion in which it concluded that Newsom was not entitled to a preliminary injunction, principally because Newsom did not demonstrate that he had a likelihood of success on the merits of any of his claims. With regard to the censorship of Newsom's t-shirt in April 2002, the district court assumed, without deciding, that the t-shirt constituted symbolic speech. The district court went on to opine that the censorship of Newsom's t-shirt was permissible because Jouett only sought to suppress the form of the message (graphic description of gunmen) and not the message itself. With regard to Newsom's due process, vagueness, and overbreadth claims, the district court ostensibly found that Newsom would not likely succeed on the merits of these claims because a school dress code need not be as detailed as a criminal code and, in view of this relaxed standard, the 2002-2003 Jouett Dress Code was not constitutionally infirm because of due process, vagueness, or overbreadth concerns. An order denying Newsom's motion for a preliminary injunction was entered by the district court and Newsom noted a timely appeal.

II

On appeal, Newsom contends that the district court erred when it denied his motion for a preliminary injunction. More specifically, he

contends that he satisfied the test governing preliminary injunctions with regard to his claims that the 2002-2003 Jouett Dress Code is both unconstitutionally overbroad and vague.

## A

We review a district court's grant or denial of a preliminary injunction for abuse of discretion. *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 932 (1975). We accept the district court's findings of fact absent clear error, but review its legal conclusions *de novo*. *North Carolina v. City of Virginia Beach*, 951 F.2d 596, 601 (4th Cir. 1992).

In deciding whether to issue a preliminary injunction, a court must consider "(1) the likelihood of irreparable harm to the plaintiff if the preliminary injunction is denied, (2) the likelihood of harm to the defendant if the requested relief is granted, (3) the likelihood that the plaintiff will succeed on the merits, and (4) the public interest." *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1992). In this case, the irreparable harm that Newsom has alleged is inseparably linked to his claim of a violation of his First Amendment rights. Determination of irreparable harm thus requires analysis of Newsom's likelihood of success on the merits, and we turn to this question first.

## B

With regard to Newsom's likelihood of success on the merits on his overbreadth claim, the principal question here is whether, after examining the record as it has developed through the preliminary injunction stage of the case, the 2002-2003 Jouett Dress Code, which prohibits, *inter alia*, "messages on clothing, jewelry, and personal belongings that relate to . . . weapons," is unconstitutionally overbroad on its face because it reaches too much expression that is protected by the First Amendment.

The First Amendment bars the government from "abridging the freedom of speech"—that is, generally, "from dictating what we see or read or speak or hear." U.S. CONST. amend. I; *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 244 (2002). Notwithstanding this

edict, courts have long recognized that a public school student's First Amendment rights are not coextensive to those held by others in other contexts. *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 682 (1986). Because most public school students are minors and school administrators have the duty to provide and facilitate education and to maintain order and discipline, the Supreme Court "has repeatedly emphasized the need for affirming the comprehensive authority of the States and of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools." *Tinker v. Des Moines Indep. Sch. Dist.*, 393 U.S. 503, 507 (1969). Consequently, while a public school student does not "shed [his] constitutional rights to freedom of speech or expression at the school-house gate," *id.* at 506, those rights may be limited as long as the limitation is consistent with constitutional safeguards.

In *Tinker*, school officials prevented a group of students from wearing black armbands to express their opposition to our country's participation in the Vietnam War. *Id.* at 504. The Court upheld the students' right to do so because there was "no evidence whatever of petitioners' interference, actual or nascent, with the schools' work or of collision with the rights of other students to be secure and to be left alone." *Id.* at 508. Responding to the school authorities' attempt to justify their actions by reason of a concern about the possibility of the armbands' creating a disturbance in school, the Court held that, "in our system, undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression." *Id.* By contrast, "conduct by the student, in class or out of it, which for any reason—whether it stems from time, place, or type of behavior—materially disrupts class work or involves substantial disorder or invasion of the rights of others is, of course, not immunized by the constitutional guarantee of freedom of speech." *Id.* at 513. Accordingly, *Tinker* "requires a specific and significant fear of disruption, not just some remote apprehension of disturbance." *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 211 (3d Cir. 2001). In sum, "if a school can point to a well-founded expectation of disruption—especially one based on past incidents arising out of similar speech—the restriction may pass constitutional muster." *Id.* at 212.

In two subsequent cases, the Supreme Court further defined the parameters of the freedom of expression in public schools. In *Fraser*,

a school disciplined a student for a student government nominating speech filled with sexual metaphor viewed by the school and the Court as lewd. 478 U.S. at 678. The Court upheld the school's authority to do so because of "society's . . . interest in teaching students the boundaries of socially appropriate behavior." *Id.* at 681. Schools are not prevented by the First Amendment from encouraging the "fundamental values of 'habits and manners of civility,'" *id.*, by "insisting that certain modes of expression are inappropriate and subject to sanctions." *Id.* at 683. And "[t]he determination of what manner of speech . . . is inappropriate properly rests with the school board." *Id.* Accordingly, *Fraser* establishes an exception to *Tinker*'s disruption requirement. Under *Fraser*, the banned school speech need not meet *Tinker*'s disruption requirement; rather, speech in school can be banned if it is lewd, vulgar, indecent, or plainly offensive. *Id.* at 685; *see also Saxe*, 240 F.3d at 213 (holding that, under *Fraser*, there is no First Amendment protection for lewd, vulgar, indecent, and plainly offensive speech in school); *Boroff v. Van Wert City Bd. of Ed.*, 220 F.3d 465, 467-71 (6th Cir. 2000) (applying *Fraser* to vulgar t-shirt of a three-headed Jesus accompanied by the words "See No Truth. Hear No Truth. Speak No Truth"), *cert. denied*, 532 U.S. 920 (2001). When speech in school falls within the lewd, vulgar, and plainly offensive rubric, it can be said that *Fraser* limits the form and manner of speech, but does not address the content of the message. *Fraser*, 478 U.S. at 685 (distinguishing *Tinker* on the basis that the lewd, vulgar, and plainly offensive speech was "unrelated to any political viewpoint"); *see also Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 286 n.2 (1988) (Brennan, J., dissenting) (*Fraser* limited "to the appropriateness of the *manner* in which the message is conveyed, not of the message's content."); *East High Gay/Straight Alliance v. Bd. of Educ. of Salt Lake City Sch. Dist.*, 81 F. Supp.2d 1166, 1193 (D. Utah 1999) ("*Fraser* speaks to the form and manner of student speech, not its substance. It addresses the mode of expression, not its content or viewpoint.").

In *Hazelwood*, the Court addressed a public school's decision to censor two articles slated for publication in the school newspaper: one concerned pregnant students at the school, the other discussed the impact of divorce on students. 484 U.S. at 263. The pregnancy story was rejected because the principal feared that, in spite of the pseudonyms used in the article, the subjects might still be identified by the

school community. *Id.* The divorce story was rejected because it contained negative information about school parents and there was insufficient time to permit them to respond to the facts set out in the article. *Id.* The Supreme Court rejected the newspaper staff members' suit on a number of bases: the school paper was not a public forum, publishing the paper was a school-sponsored activity that was part of an advanced journalism class, and readers would perceive articles appearing in the school paper as being school-approved publications. *Id.* at 268-73. In addition, the Court recognized the competing privacy interests of the pregnant students and the families going through a divorce. *Id.* The Court described when a school has greater authority to regulate student speech in this way:

> [T]he standard articulated in *Tinker* for determining when a school may punish student expression need not also be the standard for determining when a school may refuse to lend its name and resources to the dissemination of student expression. Instead, we hold that educators do not offend the First Amendment by exercising editorial control over the style and content of student speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns.

*Id.* at 272-73 (footnotes omitted).

Newsom does not contend that all clothing containing messages related to weapons worn in public schools is protected by the First Amendment. Rather, he acknowledges that Jouett could, even in the absence of a school policy, prohibit the display of violent, threatening, lewd, vulgar, indecent, or plainly offensive images and messages related to weapons under *Tinker* and *Fraser*. Newsom also correctly points out that nonviolent and nonthreatening images/messages related to weapons would fall squarely under *Tinker*'s disruption standard. *Cf. Scott v. Sch. Bd. of Alachua County*, 324 F.3d 1246, 1248-50 (11th Cir.) (upholding ban on display of the Confederate flag under *Tinker* where there was history of racial problems involving the Confederate flag), *cert. denied*, No. 02-1838, 2003 WL 21456684 (October 6, 2003); *West v. Derby Unified Sch. Dist.*, 206 F.3d 1358, 1366-67 (10th Cir. 2000) (same); *Phillips v. Anderson County Sch. Dist. 5*, 987 F. Supp. 488, 493 (D.S.C. 1997) (same). Moreover, New-

som correctly posits that Jouett's actions cannot be judged using the more lenient *Hazelwood* standard because the special circumstances present in *Hazelwood* are so clearly absent in this case. Clothing worn by Newsom and perhaps by other students that contain messages related to weapons are not school-sponsored, nor does Jouett supply any of the resources involved in the clothing worn by students. More importantly, no reasonable observer could conclude that Jouett somehow endorsed the t-shirt worn by Newsom, or any other student's clothing that contained a message related to weapons. As a result, *Tinker* is the most relevant of the three Supreme Court cases concerning school speech and sets forth the legal framework that we will use in our overbreadth analysis.

The overbreadth doctrine constitutes "a departure from traditional rules of standing." *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973). Pursuant to it, an individual may "challenge a statute on its face because it also threatens others not before the court—those who desire to engage in legally protected expression but who may refrain from doing so rather than risk prosecution or undertake to have the law declared partially invalid." *Bd. of Airport Comm'rs v. Jews for Jesus, Inc.*, 482 U.S. 569, 574 (1987) (citation and internal quotation marks omitted).

In most cases, courts will not assess the constitutionality of a provision apart from its particular application.[4] But cases involving the freedom of speech are frequently excepted from this general rule. *Los Angeles Police Dept. v. United Reporting Publ'g Corp.*, 528 U.S. 32, 38 (1999). The exception, however, is a narrow one:

> Even though the challenge be based on the First Amendment, the overbreadth doctrine is not casually employed. Because of the wide-reaching effects of striking down a statute on its face at the request of one whose own conduct may be punished despite the First Amendment, we have recog-

---

[4]An "as-applied" challenge consists of a challenge to a regulation's application only to the party before the court. *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 758-59 (1988). If an as-applied challenge is successful, the statute may not be applied to the challenger, but is otherwise enforceable. *Id.*

nized that the overbreadth doctrine is strong medicine and have employed it with hesitation, and then only as a last resort.

*Id.* at 39 (citation and internal quotation marks omitted). Accordingly, "a law should not be invalidated for overbreadth unless it reaches a substantial number of impermissible applications." *New York v. Ferber*, 458 U.S. 747, 771 (1982).[5] To prevail, an overbreadth plaintiff, like Newsom, must demonstrate that a regulation's overbreadth is "not only . . . real, but substantial as well, judged in relation to the [challenged regulation's] plainly legitimate sweep," and also that no "limiting construction" or "partial invalidation" could "remove the seeming threat or deterrence to constitutionally protected expression." *Broadrick*, 413 U.S. at 613, 615. A court, however, "will not rewrite a . . . law to conform it to constitutional requirements." *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 397 (1988).

Because this case involves speech at public schools, several additional considerations are worth noting.[6] First, "[b]ecause of the duties and responsibilities of the public elementary and secondary schools, the overbreadth doctrine warrants a more hesitant application in [the public school] setting than in other contexts." *Sypniewski v. Warren Hills Reg'l Bd. of Educ.*, 307 F.3d 243, 259 (3d Cir. 2002), *cert. denied*, 123 S. Ct. 2077 (2003). As the court in *Sypniewski* noted,

> *Tinker* acknowledges what common sense tells us: a much broader "plainly legitimate" area of speech can be regulated at school than outside school. Speech that disrupts education, causes disorder, or inappropriately interferes with other

---

[5]If an overbreadth challenge succeeds, "any enforcement" of the regulation at issue is "totally forbidden." *Broadrick*, 413 U.S. at 613.

[6]Jouett maintains that the 2002-2003 Jouett Dress Code does not regulate speech, but rather conduct, *e.g.*, "the wearing of apparel which bears 'messages that relate to . . . weapons.'" This argument must be rejected for the simple reason that the 2002-2003 Jouett Dress Code does more than just regulate conduct. The code at issue regulates speech insofar as it prohibits certain expression, *e.g.*, messages related to weapons, and leaves other types of expression, *e.g.*, messages expressing support for the school, untouched.

students' rights may be proscribed or regulated. . . . Every-day school discipline does not depend on the necessity of a speech code. In the public school setting, the First Amendment protects the nondisruptive expression of ideas. It does not erect a shield that handicaps the proper functioning of the public schools.

*Id.*

Second, courts have recognized that, even though speech codes in general are looked at with disfavor under the First Amendment because of their tendency to silence or interfere with protected speech, a public school's speech/disciplinary policy need not be as detailed as a criminal code. *Id.* at 260 (noting that, even though speech codes are disfavored under the First Amendment, "the demands of public secondary and elementary school discipline are such that it is inappropriate to expect the same level of precision in drafting school disciplinary policies as is expected of legislative bodies crafting criminal restrictions"); *see also Fraser*, 478 U.S. at 686 ("Given the school's need to be able to impose disciplinary sanctions for a wide range of unanticipated conduct disruptive of the educational process, the school disciplinary rules need not be as detailed as a criminal code which imposes criminal sanctions.").

While the 2002-2003 Jouett Dress Code prohibits students from wearing, *inter alia*, "messages on clothing, jewelry, and personal belongings that relate to drugs, alcohol, tobacco, weapons, violence, sex, vulgarity, or that reflect adversely upon persons because of their race or ethnic group," Newsom's overbreadth challenge to the 2002-2003 Jouett Dress Code is only aimed at a portion of the code. He maintains that the code's ban on "messages . . . that relate to . . . weapons" is overbroad in that it reaches too much expression that is protected by the First Amendment. More specifically, Newsom posits that the 2002-2003 Jouett Dress Code is overbroad because (1) it applies to nonviolent and nonthreatening images/messages related to weapons and (2) there is a dearth of evidence demonstrating that the display of images/messages related to weapons, nonviolent, nonthreatening, or otherwise, would substantially disrupt school operations or interfere with the rights of others.

We begin our overbreadth analysis by noting that there simply is no evidence in the record (as the record has developed through the preliminary injunction stage of the case) demonstrating that clothing worn by students at Jouett containing messages related to weapons, nonviolent, nonthreatening, or otherwise, ever substantially disrupted school operations or interfered with the rights of others. Indeed, there is no evidence that Newsom's t-shirt, let alone any other article of clothing worn by a student that contained a message relating to weapons, ever caused a commotion or was going to cause one at Jouett. This lack of evidence strongly suggests that the ban on messages related to weapons was not necessary to maintain order and discipline at Jouett.[7]

Turning to the language of the 2002-2003 Jouett Dress Code, when we examine the code in view of the fact that there was no evidence presented at the preliminary injunction stage of the case demonstrating that clothing worn by students at Jouett containing messages related to weapons, nonviolent, nonthreatening, or otherwise, ever

---

[7]Of course, a public school has the power to act to prevent problems before they occur, and the school is not limited to prohibiting and punishing conduct only after it has caused a disturbance. *See, e.g.*, *West*, 206 F.3d at 1366-67. Indeed, courts have found that *Tinker*'s standard has been met when there have been past disruptive incidents arising out of speech. *See, e.g.*, *Scott*, 324 F.3d at 1248-50 (upholding ban on display of the Confederate flag under *Tinker* where there was history of racial problems involving the Confederate flag); *West*, 206 F.3d at 1366-67 (same); *Phillips*, 987 F. Supp. at 493 (same). In the absence of past incidents, courts have concluded that school authorities have failed to establish a sufficient likelihood of disruption to support the ban on speech. *See, e.g.*, *Sypniewski*, 307 F.3d at 254-58 (reversing district court's refusal to grant preliminary injunction enjoining school from enforcing its racial harassment policy to Jeff Foxworthy "redneck" t-shirt because there was no evidence in the record suggesting that the t-shirt caused or would likely cause disruption of school operations); *Castorina ex rel. Rewt v. Madison County Sch. Bd.*, 246 F.3d 536, 542-44 (6th Cir. 2001) (vacating summary judgment for school officials where there was no showing of disruption caused by display of Confederate flag). In this case, there simply is no evidence suggesting that clothing containing messages related to weapons worn by students at Jouett ever substantially disrupted school operations or interfered with the rights of others.

substantially disrupted school operations or interfered with the rights of others, the 2002-2003 Jouett Dress Code can be understood as reaching lawful, nonviolent, and nonthreatening symbols of not only popular, but important organizations and ideals. For example, the State Seal of the Commonwealth of Virginia depicts a woman standing with one foot on the chest of a vanquished tyrant, holding a spear. The symbol obviously depicts a woman holding a weapon. Thus, under the 2002-2003 Jouett Dress Code, a student may not wear or carry any items bearing the State Seal of the Commonwealth of Virginia. Likewise, the symbol of the University of Virginia's athletic mascot—the Cavalier—is two crossed sabers. This symbol also relates to weapons. According to the Virginia Attorney General, the symbol is used throughout Charlottesville to direct visitors to the university's football stadium and other facilities and simply to promote the university's athletics. Ironically, Albemarle County High School, which is located across the street from Jack Jouett Middle School, uses the image of a patriot armed with a musket as its own mascot. Various clothing depicting support for the University of Virginia and Albemarle County High School by way of the schools' mascots would be banned under the 2002-2003 Jouett Dress Code.

Aside from these non-controversial symbols, the 2002-2003 Jouett Dress Code would apparently distinguish between a t-shirt bearing a peace sign and the message "No War" and one with a picture of an army tank in desert camouflage that urges support for our troops. Similarly, it would prevent a student from wearing a t-shirt bearing the insignia of many of the fighting units engaged in overseas operations in which parents or siblings may serve. Banning support for or affiliation with the myriad of organizations and institutions that include weapons (displayed in a nonviolent and nonthreatening manner) in their insignia can hardly be deemed reasonably related to the maintenance of a safe or distraction-free school. Finally, the quintessential political message the school here is trying to promote—"Guns and School Don't Mix"—would, under a reasonable interpretation, be prohibited on clothing under the 2002-2003 Jouett Dress Code.

Because there was no evidence presented at the preliminary injunction stage of the case demonstrating that clothing worn by students at Jouett containing messages related to weapons, nonviolent, nonthreatening, or otherwise, ever substantially disrupted school operations or

interfered with the rights of others, the number of examples of the unnecessarily broad nature of the 2002-2003 Jouett Dress Code is practically limitless. After examining the record as it has developed through the preliminary injunction stage of the case, it is evident that the 2002-2003 Jouett Dress Code disfavors weapons, displayed in any manner and in any context, and potentially any messages about weapons. It excludes a broad range and scope of symbols, images, and political messages that are entirely legitimate and even laudatory. Under these circumstances, and in the absence of any cogent limiting construction of the 2002-2003 Jouett Dress Code, we are constrained to conclude that Newsom has demonstrated a strong likelihood of success on the merits on his overbreadth claim.[8]

### C

The remaining factors to be considered in awarding a preliminary injunction—the alleged irreparable injury to the plaintiff without an injunction, the potential harm to the defendant from the injunction, and the public interest—all weigh in favor of Newsom. As to Newsom's irreparable injury, the Supreme Court has explained that "loss

---

[8]Jouett seems to suggest that the 2002-2003 Jouett Dress Code is capable of a reasonable limiting construction because two additional requirements can be read into the code: (1) a requirement that banned clothing be disruptive; and (2) a requirement that school administrators make reasonable disruption assessments. We decline to accept Jouett's invitation to read a disruption requirement into the code at issue. The text of the 2002-2003 Jouett Dress Code provides no support for such a reading insofar as the code does not state that the message related to weapons must be disruptive before it can be banned. Nor is there language in the 2002-2003 Jouett Dress Code bestowing upon school administrators the specific duty to make a disruption assessment before a message related to weapons is banned. In the absence of such additional language in the 2002-2003 Jouett Dress Code, we decline to consider whether the inclusion of such language would alter the outcome. Jouett also suggests that we can discern a reasonable limiting construction of the code because it only has been applied to "images of gunmen aiming high-powered firearms." Again, because the language of the 2002-2003 Jouett Dress Code does not even remotely suggest that it is limited to "images of gunmen aiming high-powered firearms," we reject this construction of the code as well.

of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). With respect to the harm that would befall if an injunction were put in place, Jouett is in no way harmed by issuance of a preliminary injunction which prevents it from enforcing a regulation, which, on this record, is likely to be found unconstitutional. The final prerequisite to the grant of a preliminary injunction is that it serve the public interest. Surely, upholding constitutional rights serves the public interest. *Cf. Homans v. Albuquerque*, 264 F.3d 1240, 1244 (10th Cir. 2001) ("[W]e believe that the public interest is better served by following binding Supreme Court precedent and protecting the core First Amendment right of political expression.").[9]

### III

In summary, we hold that the district court abused its discretion when it concluded that Newsom had not satisfied the test governing preliminary injunctions with regard to his claim that the challenged portion of the 2002-2003 Jouett Dress Code is unconstitutionally overbroad. Of course, our holding, like any ruling on a preliminary injunction, does not preclude a different resolution of Newsom's claims on a more fully developed record.[10]

*VACATED AND REMANDED WITH INSTRUCTIONS*

---

[9]Because we agree with Newsom that he satisfied the test governing preliminary injunctions with regard to his claim that the challenged portion of the 2002-2003 Jouett Dress Code is unconstitutionally overbroad, we need not address Newsom's vagueness argument.

[10]For the benefit of the district court on remand, we point out that the district court should apply *Tinker* to resolve Newsom's claim that his First Amendment rights were violated when he was instructed to change his t-shirt or turn it inside out in April 2002.