GOVERNOR WENTWORTH
REGIONAL SCHOOL
DISTRICT, Plaintiff

v.

Paul and Deborah HENDRICKSON, As Parents and Next Friends of Paul Hendrickson, Jr., Defendants and Counterclaim Plaintiffs

v.

Guy Donnelly, Paul MacMillan, John Robertson, and Governor Wentworth Regional School District, Counterclaim Defendants

No. CIV. 05CV–133–SM.

United States District Court,
D. New Hampshire.

March 15, 2006.

Diane M. Gorrow, Soule Leslie Kidder Zelin Sayward & Loughman, Salem, NH, John P. Sherman, Sherman & Ricker PLLC, Portsmouth, NH, for Plaintiff.

Stephen E. Borofsky, Erica U. Bodwell, Borofsky Amodeo–Vickery & Bandazian, Manchester, NH, for Defendants.

### ORDER

MCAULIFFE, Chief Judge.

This case involves a public high school principal's decision to suspend a student for refusing to remove or cover a symbolic patch he wore on his outer clothing. The case presents important issues of public school administration, pitting the obligation of teachers and administrators to provide a safe and violence-free educational environment, against the First Amendment right of public school students to free expression. The particular facts of this dispute are unique, but it is undeniable that the eruption of fatal violence at Columbine High School and other public schools casts a pragmatic shadow on what otherwise might be viewed as primarily an academic disagreement. Although a legitimate case can and has been made for each party's opposing viewpoint, the court finds that school authorities were justified under the circumstances in taking the action they did, and they did not violate the student's First–Amendment rights.

### Introduction

Paul Hendrickson, Jr., is a senior at Kingswood Regional High School, a public high school in New Hampshire's Governor Wentworth Regional School District. In the Spring of 2005, the school's principal, Mr. MacMillan, told Hendrickson that he would not be allowed on school grounds while wearing a particular patch on his clothing. Hendrickson's patch consisted of a swastika on which was superimposed the international "no" symbol—a red circle with a diagonal line through it. The patch has been characterized in different ways. Hendrickson calls it a "tolerance patch," signifying values of diversity and acceptance, but it might be more objectively described as a "No Nazis" patch.

In any event, Hendrickson, invoking his First Amendment rights, refused to remove it. School authorities, in turn, required him to leave unless and until he removed or covered it. At first, Hendrickson was sent home with parental permission. Later, after he continued to arrive at school wearing the patch and his parents declined to authorize further voluntary dismissals, Hendrickson was suspended, for so long as he insisted upon displaying the patch. (The School District did arrange for a home tutor to alleviate, to the extent possible, any educational loss.)

Wishing to resolve the conflict and clarify its legal obligations and responsibilities, the School District filed this suit, seeking a declaration of the parties' respective legal rights. The District and Hendrickson also reached an accommodation, *pendente lite*, under the terms of which Hendrickson was allowed to return to school and to wear a substitute patch exhibiting the slogan "Censored for Now."

Disputes like this one are often more complicated than they first appear, and that is certainly the case here. One's initial reaction to the very basic facts outlined above might well be that the student is, of course, entitled to express a political

viewpoint at school by passively wearing a symbolic patch. After all, such political speech is at the very core of the First Amendment's guarantee of expressive freedom. But the basic facts do not begin to tell the whole story, nor do they highlight the myriad of competing interests and values also entitled to legal respect and protection in a public school. A balancing of interests is required, and striking the proper balance can be a difficult task.

The parties agree that the legal issues raised are probably amenable to disposition by summary judgment, since the material facts are, by and large, undisputed. Cross-motions for summary judgment have been filed, and the record does not appear to present any trial-worthy factual issues.

### Factual Background

Before the somewhat complicated legal issues can be meaningfully considered, it is necessary to understand the factual context in which they arise. The undisputed material facts—those that have legal significance—are presented in the light most favorable to Hendrickson, the party opposing summary judgment.[1]

Kingswood Regional High School is a public school. Accordingly, the parties agree that school authorities were acting "under color of state law" for purposes of 42 U.S.C. § 1983. The school distributes a handbook to all students describing minimum standards governing dress and behavior while on school grounds. Standards generally relevant to this dispute provide:

**Harassment is Against the Law.** No one should have to tolerate harassment at school for any reason. Therefore, all employees, volunteers, parents, and students will interact with all persons in ways that convey respect and consideration for individuals regardless of race, color, marital status, national origin, creed, religion, gender, sexual orientation, age, or disability. *Acts of harassment, hostility, or defamation, whether verbal, written, or physical, will not be tolerated and constitute grounds for disciplinary action including, but not limited to, suspension and/or expulsion from school.* Legal agencies may be contacted.

\* \* \* \* \* \*

**Dress Code.** The Governor Wentworth Regional School *Board has a responsibility to assure that the atmosphere in the schools is conducive to learning and fosters an environment of respect.* Student dress plays an important part in creating an educational tone that demands both academic rigor and high standards of discipline. . . .

The standard for student dress in the Governor Wentworth Regional School District allows, within a defined set of parameters, a choice in clothing. *Generally speaking, each individual is allowed to dress according to her/his personal preference provided that the execution of her/his selection does not* interfere with the rights of others, *cause disruption to the educational program,* damage school property, or is considered a health or safety hazard.

Exhibit E to defendant's memorandum (emphasis supplied). The dress code goes on to provide that "[d]ress . . . shall not be such as to disrupt the teaching/learning process." *Id.*

During the 2004–2005 academic year, administrators at Kingswood High learned of, and monitored, many incidents of bullying and harassment. At least five of those

---

1. The court will take up the School District's motion first.

incidents involved conflicts between two readily identifiable groups—one in which Hendrickson is a member (described or generally known as the "gay students") and a rival group (described or generally known as the "homophobes" and/or "rednecks"). In January of 2005, in response to a recognized increase in tension between those two groups, school administrators conducted a school-wide "Assembly on Tolerance." The assembly focused on encouraging students to peacefully co-exist with others of different racial, religious, social, sexual, and political viewpoints.

That very afternoon, however, an incident of harassment or bullying occurred involving a member of Hendrickson's group and a member of the "redneck" group. Administrators investigated the incident and interviewed the victim, who was unwilling to name his harasser. Subsequently, however, administrators were able to identify the harasser and imposed discipline.[2]

Shortly thereafter, the parent of a student associated with the "redneck" group contacted the school to report that she had received a threatening telephone call. The caller warned that her home would be burned down. School authorities advised her to keep her son at home until the matter could be investigated. Later that same day, the parent of another boy associated with the "redneck" group called the school to report that her son had received a threatening instant message over the Internet. The sender threatened to carve his initials in her son's head.

Ms. Shatzer, the school's student coordinator, investigated both incidents. She interviewed several students, including Hendrickson. According to Ms. Shatzer,

Hendrickson admitted that he sent the threatening instant message to the rival "redneck" group member. Another member of Hendrickson's group admitted that he threatened to burn down the other student's home. Shatzer affidavit, Exhibit B to plaintiff's memorandum (document no. 25), at para. 7. Hendrickson, however, denies involvement in either incident, though he does not deny that each actually occurred.

Ms. Shatzer contacted the parents of the boys who had been threatened, told them that the school had identified the students who made the threats, and that those students had been warned against similar conduct in the future. Both parents agreed to return their sons to school the next day. It is unclear whether the victims of those threats, or school administrators, reported the incidents to local police.

Despite continuing efforts to ease tensions between the two groups, administrators learned a few days later of another incident of harassment or threatening involving the same two groups of students. Again, Ms. Shatzer met with one of the offending students, encouraged him to be more tolerant of members of the rival group, and warned him against similar conduct in the future. The next day, school administrators again met with that boy and, this time, they involved his mother. Both the student and his mother were warned that similar conduct in the future would result in police involvement. They also told the boy and his mother that all other students involved in the offending conduct would be given the same message.

Nevertheless, tensions between the two groups remained high. During lunch peri-

---

**2.** These incidents are reported by the School District in an indistinct manner, no doubt sparing detail that might serve to identify particular students. Two significant incidents

discussed *infra*, however, do provide sufficient detail and provide adequate justification, in the overall context, for the action taken.

ods, the rival groups insisted on sitting at adjoining tables, with their backs to each other. Tension between the two groups was "so palpable" that Principal MacMillan referred to the dining hall as the "DMZ" and instructed supervisors to keep a particularly close watch over the boys.

During February of that year, the school again sought to ease tensions between the two groups by meeting individually with students associated with each group and their parents. School administrators informed the students and parents that any continued taunting, harassing, or threatening conduct would result in discipline and the involvement of the police. Nevertheless, a week later, another incident of harassment involving students from those two groups occurred. Following an investigation by the school, three boys were suspended. Once again, school administrators met with the students and their parents.

During one of those meetings, a parent informed Ms. Shatzer that she was concerned about what she believed was her son's unhealthy fascination with, and admiration of, Adolph Hitler. The parent said that her son viewed Hitler as a hero and she said he strongly believed in the ideals of the Nazi movement. She also said that her son had been taking Hitler-related books out of the library, a fact that administrators later confirmed. The record also reveals that, in an effort to intimidate or provoke members of Hendrickson's group, at least some of the boys in the "redneck" group would occasionally accost them in the school's hallways with renditions of the Nazi salute, "Seig Heil." In his affidavit, Principal MacMillan says he construed those cumulative facts as warning signs of potential violence, especially given the widely publicized reports of fatal violence committed at other schools by students who also shared interests in Hitler and the Nazi movement.

On February 25, 2005, students began their winter break. They returned to school on March 7, 2005. On that day, Principal MacMillan and two other school administrators met with the student who had been the subject of two incidents of harassment or bullying a few weeks earlier, and his parent. They informed the student and his parent of their continuing efforts to diffuse tensions between the two groups. They also reported that they had met with members of both groups and had warned everyone that future acts of intimidation, threatening, and/or bullying would not be tolerated and would result in police involvement.

School administrators credit their continuing vigilance and affirmative efforts to confront and resolve these problems with having had some positive effect on student conduct. During the following three weeks, there were no reported incidents of harassment, taunting, or threatening behavior involving the two groups.

On March 22, 2005, Principal MacMillan learned that a 16 year-old student in Red Lake, Minnesota, killed nine people at his school, including a teacher and five students. He also learned that the student professed an admiration for Hitler, and doodled swastikas in his school notebooks. MacMillan met with School Superintendent John Robertson to discuss his growing concern that some of the students at Kingswood Regional High School also seemed to be fascinated by Hitler and the Nazi movement.

The next week, on March 28, 2005, Hendrickson and two other members of his group came to school wearing the patch depicting a swastika under the "no" symbol. That day passed without incident. The next day Hendrickson and his friends again arrived at school wearing the patch.

Principal MacMillan says that is when he first became aware of the patch's existence. According to MacMillan's uncontested affidavit, he was concerned that Hendrickson's patch amounted to "a specific and targeted message at the group of students with whom [Hendrickson] and students with whom he associated had had several prior incidents ... two of which involved specific threats of physical violence [i.e., the telephone threat to burn down the house and the threat to carve initials in a student's head]." MacMillan affidavit at para. 19. A student wearing the patch (not Hendrickson) was summoned to the school's administrative offices and was asked to remove it.

Later that same day, Hendrickson, now aware that one of his friends had been asked to remove the patch, sought a meeting with school administrators. Principal MacMillan and several other school administrators met with Hendrickson. Principal MacMillan told Hendrickson that he was concerned about the volatile history between Hendrickson's group and the so-called "rednecks." He also said that he believed Hendrickson's patch was specifically aimed at, and designed to provoke a potentially disruptive or even violent response from that group. He asked Hendrickson if there was another type of patch or armband that he could wear to express his views on tolerance, without provoking students in the rival group and causing a disruption in school.

Principal MacMillan says he told Hendrickson that he was concerned not only for Hendrickson's own safety, but for the safety of other students as well, given that the patch might spark a disruptive or violent response from the "redneck" group. Other administrators participating in the meeting offered to help in creating a forum or alternate vehicle for Hendrickson to express his stated goal of promoting tolerance. Hendrickson said he did not wish to consider other options. At that point, Principal MacMillan told Hendrickson that if he wished to remain in school, he would have to remove the patch. Hendrickson refused. He was then given the option of being suspended or having his mother voluntarily dismiss him from school. Hendrickson contacted his mother and she voluntarily dismissed him. MacMillan informed Hendrickson that he could not return to school wearing the patch.

Following his meeting with Hendrickson, Principal MacMillan noticed that approximately six students had gathered in the administration office, waiting to see what happened to Hendrickson. The assistant principal asked the students to return to class but, at least initially, they refused. Eventually, the students left the office and Hendrickson left school for the day. Later, Principal MacMillan says, one member of the so-called "redneck" group told him that he considered Hendrickson's patch to be a "hate patch," specifically directed at him and his group. Citing his concerns for potential disruption and violence in the school, MacMillan informed school officials that students were not allowed to wear the patch at school.

Notwithstanding Principal MacMillan's directive, Hendrickson returned the following day, wearing the patch. Two other students joined him in wearing the patch. Assistant Principal Donnelly again met with Hendrickson to discuss the situation, the potential for disruption and violence posed by the patch, and alternate means by which he might express his asserted message of tolerance—such as a different patch or wristband that did not target the "redneck" group or create the potential for disruption. Hendrickson said he would consider the idea, but would have to speak with his friends.

Donnelly later met with the two other boys in Hendrickson's group who had worn the patch that day. He told them that he believed the patch was specifically targeted at the rival group with which they had ongoing problems of harassment, bullying, and threats of violence. One of the students mentioned that, when they walked past students in the rival group, "they would say, 'Seig Heil' in an intimidating way." Donnelly affidavit at para. 12. Donnelly told the boys that incidents of that sort reinforced his belief that the patch was specifically designed to target or provoke a response from the rival group and carried with it the potential for disruption or violence in the school.

That afternoon, Hendrickson and the two other boys who had worn the patch met with Superintendent Robertson who, like Principal MacMillan, discussed with them the incidents of harassment and threats of physical violence between the two groups. He also explained the school's obligation to provide a safe educational environment, free from bullying, harassment, violence, and other forms of disruption. He then discussed alternative ways in which the boys could express their asserted views on tolerance, that did not involve provoking the "redneck" group.

According to Robertson's affidavit, Hendrickson responded by asserting a First Amendment right to wear the so-called "tolerance" patch, and said he was not afraid of the "Nazis" and "homophobes." When Robertson pointed out that the patch could lead to physical violence, Hendrickson replied that he "wanted to get into their faces." He then added that, if a physical confrontation with the "redneck" group did occur, he would be prepared to take action against them. Affidavit of Superintendent John Robertson, Exhibit D to plaintiff's memorandum, at para. 22.

Hendrickson was again given the option of suspension or voluntary dismissal with his parent's consent. Hendrickson's mother agreed to dismiss him. The next day, Hendrickson again returned to school wearing the patch. This time, either he was not offered the option of dismissal, or his mother refused to permit it. In either event, Hendrickson was suspended for the day and sent home. When Superintendent Robertson learned that other students had also worn the patch to school, he instructed administrators to dismiss them if they did not agree to remove the patch. Most agreed, though two did not, resulting in a brief confrontation between one of those students and school administrators.

The following day, April 1, 2005, Hendrickson returned to school, once again wearing the patch. And, again, he was suspended. Later that day, Hendrickson's mother came to the school to discuss the situation with Principal MacMillan and Assistant Principal Donnelly. They reviewed the history of bullying, harassment, and hostility between the two groups, the threatened acts of violence, and their belief that tension between the two groups had to be relieved if further disruption, and violence, was to be avoided. They also told her that they had spent a substantial amount of time with the students themselves, with other administrators, and with the police, in an effort to diffuse tension between the two groups. When they asked Hendrickson's mother whether she thought he would agree to express his professed message of tolerance through different means, she responded that the decision was her son's to make, though she doubted he would agree to remove the patch.

Hendrickson appears to have remained out of school for several days (if not weeks). Some days, he came to school or after-school events, without the patch.

Other days, it appears he remained at home where he was tutored. In May (the precise date is unclear), Hendrickson returned to school wearing a patch that said, "Censored for Now." Administrators deemed that patch inappropriate as well, though their reasoning is not disclosed in the record, and Hendrickson was sent home. Eventually, the administration relented and, at the urging of Hendrickson's legal counsel, allowed him to wear the "Censured for Now" patch during the school day and on school grounds.

Hendrickson remains resolute in his belief that school administrators unlawfully stifled his constitutionally protected symbolic speech. Administrators, on the other hand, remain firm in believing that they acted appropriately, given both the factual context in which they decided to ban the patch and their obligation to provide a safe and secure educational environment, reasonably free of disruption.

It is perhaps worth noting that, to the extent Hendrickson was sincerely interested in expressing a message of tolerance, school administrators were more than happy to help him spread that message. Indeed, it was a message they fully embraced and were actively communicating to the student body. Their concern, however, was that Hendrickson's means of expressing tolerance, whether he intended it or not, could reasonably be viewed as a deliberate provocation of the adversary group.

### Standard of Review

When ruling on a party's motion for summary judgment, the court must "view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." *Griggs–Ryan v. Smith,* 904 F.2d 112, 115 (1st Cir.1990). Summary judgment is appropriate when the record reveals "no genuine issue as to

any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In this context, "a fact is 'material' if it potentially affects the outcome of the suit and a dispute over it is 'genuine' if the parties' positions on the issue are supported by conflicting evidence." *Int'l Ass'n of Machinists & Aerospace Workers v. Winship Green Nursing Ctr.,* 103 F.3d 196, 199–200 (1st Cir.1996) (citations omitted).

Nevertheless, if the non-moving party's "evidence is merely colorable, or is not significantly probative," no genuine dispute as to a material fact has been proved, and "summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (citations omitted). As the Court of Appeals for the First Circuit has observed, "the evidence illustrating the factual controversy cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve at an ensuing trial. Conclusory allegations, improbable inferences, and unsupported speculation will not suffice." *Cadle Co. v. Hayes,* 116 F.3d 957, 960 (1st Cir.1997) (citations and internal quotation marks omitted). *See also Coyne v. City of Somerville,* 972 F.2d 440, 444–45 (1st Cir.1992) ("[T]hough for pleading purposes the line between sufficient facts and insufficient conclusions is often blurred, we nonetheless require that it be plotted.") (citation and internal punctuation omitted).

The key, then, to defeating a properly supported motion for summary judgment is the non-movant's ability to support his or her claims concerning disputed material facts with *evidence* that conflicts with that proffered by the moving party. *See generally* Fed.R.Civ.P. 56(e). Consequently, while a reviewing court must take into account all properly documented facts, it

may ignore bald assertions, unsupported conclusions, and mere speculation. *See Serapion v. Martinez,* 119 F.3d 982, 987 (1st Cir.1997).

### Discussion

Before resolving the parties' pending motions for summary judgment, it would be helpful to identify several issues that are not presented in this case. First, as noted at the outset, the parties agree that those named in defendants' counterclaims are "state actors," who were acting under color of state law when they told Hendrickson he could not wear the patch. *See generally* 42 U.S.C. § 1983.

Next, there does not appear to be any dispute that school administrators enforced the provisions of the Kingswood Student Handbook in a uniform manner. That is to say, Hendrickson does not assert that school administrators prohibited him from wearing his communicative patch, while allowing other students to wear similarly provocative patches, jewelry, shirts, or jackets. Thus, this case is distinguishable from those like *Castorina v. Madison County Sch. Bd.,* 246 F.3d 536 (6th Cir.2001), in which the school board prohibited plaintiffs from wearing shirts bearing the confederate flag, but allowed other students to wear shirts venerating Malcolm X that were, under the prevailing circumstances, arguably at least as provocative.

The court also notes that Hendrickson has not challenged the School District's decision to temporarily ban the "Censored for Now" patch—a decision that also implicated constitutional protections. Instead, both the School District's suit for declaratory judgment and Hendrickson's counterclaims focus exclusively on the decision to prohibit Hendrickson from wearing the "No Nazis" patch.

Finally, accepting Hendrickson's assertion that his patch was meant to convey (and would reasonably be understood by others to convey) a message of tolerance, he cannot reasonably argue that he was the victim of viewpoint discrimination. As noted above, to the extent Hendrickson is sincere in claiming that his patch was meant to promote the idea and values of tolerance, school administrators fully embraced and endorsed that viewpoint. He was not prohibited from wearing the patch because school administrators disagreed with his asserted message of tolerance. *See, e.g., Bethel Sch. Dist. v. Fraser,* 478 U.S. 675, 689, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986) (Brennan, J., concurring) ("There is no suggestion that school officials attempted to regulate respondent's speech because they disagreed with the views he sought to express.").

On the other hand, discounting Hendrickson's assertion that the patch was intended to (and did) express a message of tolerance, and accepting a more plausible and objective interpretation—that the patch conveyed opposition to Nazis and the views and values espoused by Nazis, and was consistent with, as Hendrickson put it, his desire to "get in the faces" of the rival "redneck" group—school administrators concede that their decision to prohibit Hendrickson from wearing the patch *was* related in part to the viewpoint it appeared to express. Not opposition to an abstract anti-totalitarian viewpoint, but opposition to a provocative characterization and condemnation of a discrete group of students with whom Hendrickson and his friends had had ongoing disputes that manifested themselves in incidents of harassment, bullying, and threatened violence. The patch essentially said to the redneck group, albeit symbolically, "You are Nazis, and I am opposed to your being in this school." At least it could reasonably be construed as communicating that or a substantively

similar message. As the School District puts it:

> This patch, regardless of how it is now characterized [i.e., as one espousing tolerance], is completely contrary to one of the school's fundamental missions. It is a message of intolerance, a message of hate and dislike, that targeted other students. It was spiteful and aggressive toward another group of students [the "rednecks"].

Plaintiffs' memorandum in support of summary judgment (document no. 25) at 47.

## I. The First Amendment—Governing Legal Framework.

 It is well established that neither students nor teachers "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Indep. Community Sch. Dist.*, 393 U.S. 503, 506, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). But, on the other hand, it is equally plain that "the constitutional rights of students in public school are not automatically coextensive with the rights of adults in other settings." *Fraser,* 478 U.S. at 682, 106 S.Ct. 3159. Consequently, under appropriate circumstances, students may be prohibited from engaging in speech or expressive conduct in school that the state could not prohibit outside the school context.

 Although there is no easy or precise test that school administrators can use to determine when they may properly suppress or limit a student's speech—factual circumstances often differ significantly—the Supreme Court has offered some general guidance. Public school administrators cannot ban the "silent, passive expression of opinion, unaccompanied by any disorder or disturbance on the part of [the student]." *Tinker,* 393 U.S. at 508, 89 S.Ct. 733. But, student speech "which for any reason ... materially disrupts class-work or involves substantial disorder or invasion of the rights of others is, of course, not immunized by the constitutional guarantee of freedom of speech." *Id.* at 513, 89 S.Ct. 733.

Since *Tinker,* the Supreme Court has twice considered the limits on a public school student's First Amendment freedoms. In *Fraser, supra,* the Court upheld a school's decision to discipline a student after he used offensive and vulgar sexual innuendo in a speech given to a student assembly. The Court concluded that "it is a highly appropriate function of public school education to prohibit the use of vulgar and offensive terms in public discourse." *Id.* at 683, 106 S.Ct. 3159. Explaining its decision, the Court quoted Justice Black's dissent in *Tinker,* noting that it was "especially relevant":

> I wish therefore, ... to disclaim any purpose ... to hold that the Federal Constitution compels the teachers, parents, and elected school officials to surrender control of the American public school system to public school students.

*Fraser,* 478 U.S. at 686, 106 S.Ct. 3159 (quoting *Tinker* 393 U.S. at 526, 89 S.Ct. 733 (Black, J., dissenting)). Justice Black observed that, "[u]ncontrolled and uncontrollable liberty is an enemy to domestic peace. We cannot close our eyes to the fact that some of the country's greatest problems are crimes committed by the youth, too many of school age. School discipline, like parental discipline, is an integral and important part of training our children to be good citizens." *Id.* at 524, 89 S.Ct. 733.

In *Hazelwood Sch. Dist. v. Kuhlmeier,* 484 U.S. 260, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988), the Court concluded that school officials were entitled to exercise greater control over "school-sponsored" speech, such as the content of a student newspaper.

420

[T]he standard articulated in *Tinker* for determining when a school may punish student expression need not also be the standard for determining when a school may refuse to lend its name and resources to the dissemination of student expression. Instead, we hold that educators do not offend the First Amendment by exercising editorial control over the style and content of student speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns.

*Id.* at 272–73, 108 S.Ct. 562.

In this case, of course, school administrators were not faced with either school-sponsored speech, or vulgar, sexually explicit, or morally objectionable speech. So, the Court's decisions in *Fraser* and *Hazelwood* are not directly applicable to this dispute. Nevertheless, each clearly recognizes the fundamental importance of the educational mission entrusted to the public school system, and the critical necessity of maintaining an orderly environment in which learning can take place. As the Court of Appeals for the Third Circuit observed:

The public school setting demands a special approach to First Amendment disputes. Most students are minors, and school administrators must have authority to provide and facilitate education and to maintain order. The Supreme Court "has repeatedly emphasized the need for affirming the comprehensive authority of the States and of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 507, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). On the other hand, "[i]t can hardly be argued that either students

or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Id.* at 506, 89 S.Ct. 733. Thus, students retain the protections of the First Amendment, but the shape of these rights in the public school setting may not always mirror the contours of constitutional protections afforded in other contexts.

*Sypniewski v. Warren Hills Regional Bd. of Educ.*, 307 F.3d 243, 252–53 (3d Cir. 2002).

Here, the controlling Supreme Court precedent is *Tinker*. And, as in *Tinker*, this case involves "the area where students in the exercise of First Amendment rights collide with the rules of the school authorities." *Tinker*, 393 U.S. at 507, 89 S.Ct. 733. In a similar case the Sixth Circuit observed:

This is a troubling case; on the one hand we are faced with the exercise of the fundamental constitutional right to freedom of speech, and on the other with the oft conflicting, but equally important, need to maintain decorum in our public schools so that the learning process may be carried out in an orderly manner.

*Melton v. Young*, 465 F.2d 1332, 1334 (6th Cir.1972).

■ To prevail on its motion for summary judgment, the School District must show that, as a matter of law, the decision to suppress Hendrickson's passive symbolic speech was justified because school administrators reasonably concluded that displaying the "No Nazis" patch was likely to "materially disrupt" the educational environment, precipitate "substantial disorder," or involve an "invasion of the rights of others." *Tinker*, 393 U.S. at 513, 89 S.Ct. 733. Concerns regarding disorder or disruption are "reasonable" if those charged with maintaining order and a via-

ble educational environment can point to specific facts "which might reasonably have led [them] to forecast substantial disruption of or material interference with school activities." *Id.* at 514, 89 S.Ct. 733. *See also Saxe v. State College Area Sch. Dist.*, 240 F.3d 200, 212 (3d Cir.2001) ("[I]f a school can point to a well-founded expectation of disruption—especially one based on past incidents arising out of similar speech—the restriction may pass constitutional muster."); *Boroff v. Van Wert City Bd. of Educ.*, 220 F.3d 465, 470 (6th Cir. 2000) (holding that the standard by which the school administrators' decision to suppress student speech is measured is whether those administrators acted in a "manifestly unreasonable" manner, under the circumstances).

It is also well established that school administrators need not wait until after incidents of disruption or violence have occurred before they step in. School authorities may lawfully, and indeed are obligated to, take reasonable measures to prevent such incidents and diffuse existing tensions. *See, e.g., Melton*, 465 F.2d at 1335 ("Surely those charged with providing a place and atmosphere for educating young Americans should not have to fashion their disciplinary rules only after good order has been at least once demolished."); *Phillips v. Anderson County Sch. Dist.*, 987 F.Supp. 488, 492 (D.S.C.1997) ("School authorities ... are not required to wait until disorder or invasion occurs. If there are substantial facts which reasonably support a forecast of likely disruption, the judgment of the school authorities in denying permission and in exercising restraint will normally be sustained. Indeed, it has been held that the school authorities have a duty to *prevent* the occurrence of disturbances.") (citations and internal punctuation omitted) (emphasis in original).

On the other hand, a mere "undifferentiated fear or apprehension of disturbance is not enough to overcome [Hendrickson's] right to freedom of expression." *Id.* at 508. As noted in *Castorina*, 246 F.3d at 545, "[t]he critical issue ... is whether the principal acted on what he reasonably believed to be actual evidence that the shirts [bearing the confederate flag] would be disruptive. So long as he was told by a student that a confederate flag was the subject of the prior fight and he was not unreasonable for believing that student, he had a reasonable basis to infer that plaintiffs' shirts would spark more disruption" (Kennedy, J. concurring).

The critical question raised by the parties' opposing motions in this case, then, is how (and where) to draw the line between a reasonable (and legally sufficient) fear of disturbance, and one that is merely "undifferentiated." The School District's burden is a substantial one since, as the Supreme Court noted:

> Any departure from absolute regimen may cause trouble. Any variation from the majority's opinion may inspire fear. Any word spoken, in class, in the lunchroom, or on the campus, that deviates from the views of another person may start an argument or cause a disturbance. But our Constitution says we must take this risk; and our history says that it is this sort of hazardous freedom—this kind of openness—that is the basis of our national strength and of the independence and vigor of Americans who grow up and live in this relatively permissive, often disputatious, society.

*Tinker*, 393 U.S. at 508–09, 89 S.Ct. 733. In other words, the School District must demonstrate that "its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness

that always accompany an unpopular viewpoint." *Id.* at 509, 89 S.Ct. 733.

## II. *Suppression of Hendrickson's Speech was Lawful.*

■ Hendrickson's position is a bit odd. As mentioned, he disputes the "No Nazis" interpretation of his patch. Instead, he says the patch is intended to communicate his adherence to and promotion of the values of tolerance, diversity, and acceptance. Although he doesn't put it quite this way, Hendrickson's reasoning seems to be that the patch symbolizes opposition (the international "no" symbol) to intolerance (the swastika, representing fascism, national socialism, and totalitarianism), and that symbolic opposition to intolerance is, itself, a message of tolerance. Perhaps. But neither school authorities nor this court are required to naively accept Hendrickson's implausible declaration of the patch's intended message.[3]

If Hendrickson intended nothing more than a message of tolerance, then school authorities and he shared a mutual commitment. If, on the other hand, he intended the patch as a message to the "redneck" group, or if school authorities could reasonably conclude that the patch was directed at and was likely to provoke the "redneck" group, then it was incumbent upon them to assess the risk of disruption

and violence posed by the patch and respond in a measured and reasonable way.

The dispositive issue here turns on the reasonableness of the school authorities' assessment of the patch's likely purpose, the message likely to be taken by those exposed to it, and their assessment of the likelihood that, under all of the circumstances known to them, displaying the patch at school would result in substantial disorder or a disruption of the educational environment. It seems plain that a reasonable person would readily understand the patch to express opposition to Nazis and national socialism, as well as totalitarianism, fascism, intolerance, and like ideas. Most people living in a democratic society, particularly those whose countries went to war to defeat the Nazi regime, would probably enthusiastically join in affirming identical opposition. The First Amendment unquestionably protects the expression of that political viewpoint in a public forum. And, even in a public school setting, under ordinary circumstances, the First Amendment protects such passive symbolic speech.

But the circumstances prevailing at Kingswood Regional High School during the 2004–2005 school year were anything but ordinary. Given the overall context of demonstrated and continuing hostility over a substantial period of time between the

---

**3.** When dealing with expressive conduct (rather than pure "speech"), the Supreme Court has made it clear that courts must apply an objective, rather than subjective, test in determining the message that is conveyed by that expressive conduct. In other words, the "message" that is conveyed by the symbolic speech is determined from the perspective of a reasonable and well-informed observer, rather than from the perspective of the party engaged in that symbolic speech.

While we have rejected the view that an apparently limitless variety of conduct can be labeled "speech" whenever the person engaging in the conduct intends thereby to

express an idea, we have acknowledged that conduct may be sufficiently imbued with elements of communication to fall within the scope of the First and Fourteenth Amendments. In deciding whether particular conduct possesses sufficient communicative elements to bring the First Amendment into play, we have asked whether an intent to convey a particularized message was present, and whether the likelihood was great that the message would be understood by those who viewed it.

*Texas v. Johnson*, 491 U.S. 397, 404, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989) (citations and internal punctuation omitted).

two identified groups of students, and given the extensive and continuous efforts by school administrators to supervise those two groups, and to counsel peace and tolerance (both to them specifically and the student body in general), and given the ongoing incidents of harassment between the two groups, requiring the imposition of discipline, including suspensions, as well as two known instances of threats of physical violence, it was not unreasonable for school authorities to put more faith in their own informed and experienced judgment as to what was really going on, than in Hendrickson's not-so-plausible explanation of the patch's intended message and purpose.

So, it comes down to this: whether the record establishes that school authorities prohibited the "No Nazis" patch based upon their reasonable forecast that allowing it to be worn would likely have caused a substantial disruption of, or material interference with school activities. It does.

School authorities could have reasonably concluded, under the prevailing circumstances, that Hendrickson's symbolic speech, as embodied in the "No Nazis" patch, was a message intended for and aimed directly at the "redneck" group. They also could have reasonably inferred that Hendrickson's patch amounted to a confrontational challenge to, or provocation of, that group of students.

The objectively manifested message of the patch is "No Nazis." Given the history, school authorities could easily conclude that the "redneck" group was being deliberately painted by Hendrickson's group as Nazis, fascists, or oppressors. While some in the "redneck" group may have gladly accepted that characterization (e.g., those with an affinity for uttering the "Sieg Heil" greeting and those who admired Hitler), still, even they might be expected to take umbrage at the "No" symbol insofar as it constituted a direct statement of re-

jection of them and their group by Hendrickson's group. Others associated with the "redneck" group could, no doubt, reasonably be expected to take umbrage at both the classification and condemnation of them as Nazis. "Nazi" and "redneck" are not generally regarded as synonymous classifications, and most people who gladly accept the latter would probably object to being lumped in with the former.

The patch, in the overall factual context then prevailing at the school, was decidedly more than a passive symbolic statement of adherence to a general political or social belief in tolerance. School authorities reasonably determined that it was actually a taunt, aimed directly at the opposing group of students. They also reasonably concluded that it was meant to be confrontational, consistent with Hendrickson's concession to the Superintendent—that he wanted to "get in their [members of the 'redneck' group] faces." It was also consistent with the continuous pattern of hostility and the incidents of provocation, harassment, and threats between these two groups. School authorities were not required to put their heads in the sand and allow further escalation of that hostility, and concomitant disruption of the school environment, simply because Hendrickson cloaked his patch in a laudable First Amendment justification.

The First Amendment does not deprive school administrators of the ability to rely upon their own considerable experience, expertise, and judgment in recognizing and diffusing the potential for disruption and violence in public schools. Indeed, they are duty-bound to do just that. *See, e.g., Marquay v. Eno,* 139 N.H. 708, 717, 662 A.2d 272 (1995) ("School attendance impairs both the ability of students to protect themselves and the ability of their parents to protect them. It is this impairment of protection from which the special relation-

ship between school and student arises and from which the duty of supervision flows."). That duty is particularly acute when threats of physical violence have already been made and actual violence could well erupt if the hostile situation is not promptly and emphatically controlled.

School violence is, sadly, "an unfortunate reality that educators must confront on an all too frequent basis." *LaVine v. Blaine School District*, 257 F.3d 981, 987 (9th Cir.2001). Here, school authorities did not act precipitously, nor did they overreact to a single incident. Rather, they carefully and methodically worked, over a substantial period, to alleviate the continuing hostility between the two groups, and banned Hendrickson's patch not as punishment, but only based upon their considered assessment of all that had gone on before, the then prevailing circumstances, and their expert judgment about the patch's actual message and its likely effect, in the context that presented itself. Their decision, involving as it did the safety of their students, is entitled to a fair measure of judicial deference, even when freedom of expression is involved. *Id.* at 992. School authorities were aware of the history, tension, manifested hostility, and student personalities involved. That knowledge and familiarity with the school and its students, reasonably led them to forecast substantial disruption of or a material interference with school activities. *Tinker*, 393 U.S. at 514, 89 S.Ct. 733. It was reasonable for school authorities to conclude, under all of the circumstances, that if Hendrickson were permitted to wear the patch, it would likely precipitate further discord, tension, harassment, and disruptive, even potentially violent, behavior at school. That, in turn, would disrupt the educational environment and jeopardize the safety of not only the members of the "gay" and "redneck" groups, but all students, teachers, and staff as well. The patch was lawfully

banned, in this case, under these circumstances.

### III. *Hendrickson's Other Claims.*

Hendrickson will soon be graduating from high school. And, in an effort to expedite resolution of this case, he has moved to withdraw his claim for "monetary damages against the [School] District." Defendants' motion to withdraw claim (document no. 36). He has also waived his right to a jury trial, though this summary disposition renders that waiver moot.

Hendrickson's "motion to withdraw claim for monetary damages" makes clear that he has withdrawn his request for a jury trial and all monetary claims against the School District, but it makes no specific mention of monetary claims against the individual defendants. Nevertheless, the court concludes that Hendrickson necessarily intended to withdraw *all* monetary claims advanced in his counterclaim complaint, including those against the individual defendants, because failure to do so would preclude resolution of this matter on the merits of his request for permanent injunctive relief, *see Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959)—an obstacle he unmistakably intended to remove. Accordingly, that motion is granted and all monetary claims are dismissed.

Parenthetically, the court notes that: (1) even if Hendrickson had proved that his First Amendment rights had been violated, the individual defendants (in their individual capacities) would be entitled to qualified immunity with regard to Hendrickson's federal constitutional claims; (2) Hendrickson has failed to point to an official "custom or policy" of the School District that served as the motivating force behind the alleged violation of his federally

protected rights and, therefore, has no monetary claim against those defendants in their official capacities; (3) Hendrickson has failed to demonstrate that the state statute he says defendants violated—N.H.Rev.Stat. Ann. ch. 195–E—provides a private right of action to those allegedly injured by its violation; (4) Hendrickson has failed to identify any precedent suggesting that the New Hampshire Constitution affords broader protections in the area of public student free speech than the United States Constitution; and, finally, (5) he has failed to show that he is a member of a class intended to be protected by the provisions of section 1985(3).[4]

Accordingly, it is unlikely that any of his other claims against those defendants would have survived summary judgment had he not withdrawn them. In any event, he has moved to withdrawn those claims. That motion is granted and those claims are dismissed.

### Conclusion

To be sure, if a state actor had attempted to prevent Hendrickson from wearing the so-called "tolerance" patch in a traditional public forum, this case could easily be resolved in Hendrickson's favor. Even if his "tolerance" patch was specifically targeted at a particular group, and even if it expressed disdain or hatred for that group, still, the Constitution protects such symbolic speech.

But, public schools are not traditional public forums, like the town square or a public sidewalk. Children are generally required by law to attend school through age 16, and thereafter most remain in pursuit of valuable learning and training. Teachers and administrators are obligated not only to educate, but also to protect public school students from harm and provide them with a safe, secure, and effective learning environment. Those are important obligations, and they must be balanced against students' rights to engage in free expression, which right is itself an essential part of the educational process. It is often a difficult balance to strike, but it must be done.

Courts, in the end, must decide whether the balance has been lawfully struck, but should avoid too quickly second-guessing, from the quiet confines of a judge's chambers, the complex and difficult decisions made on a daily basis by teachers and school administrators. School authorities are generally in a far better position to understand their students and the students' likely response to various modes of intervention. They are entitled to a healthy measure of deference when exercising judgment, drawing inferences, and reaching conclusions about what is actually going on in their schools and classrooms. *See, e.g., Fraser,* 478 U.S. at 683, 106 S.Ct. 3159 ("The determination of what manner of speech in the classroom or in school assembly is inappropriate properly rests with the school board."); *Tinker,* 393 U.S. at 507, 89 S.Ct. 733 ("[T]he Court has repeatedly emphasized the need for affirming the comprehensive authority of the States and of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools."); *Epperson v. Arkansas,* 393 U.S. 97, 104, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968) ("Judicial interposition in the operation of the public school system of the Nation raises problems requiring care and

---

**4.** *See, e.g., Diva's Inc. v. City of Bangor,* 411 F.3d 30, 38–39 (1st Cir.2005) (noting that, "in order to state a claim under Section 1985(3), the plaintiff must, among other requirements, allege that the conspiratorial conduct of which he complains is propelled by some racial, or perhaps otherwise class-based, invidiously discriminatory animus.") (citations and internal punctuation omitted).

restraint.... By and large, public education in our Nation is committed to the control of state and local authorities."). Here, school authorities acted appropriately in light of the circumstances they faced, as they reasonably construed them.

For the foregoing reasons, the School District's motion for summary judgment (document no. 25) is granted. Hendrickson's Motion to Withdraw Claim for Monetary Damages and Jury Trial (document no. 36) is granted, but his motion for summary judgment (document no. 23) is denied. The Clerk of Court shall enter judgment in accordance with this order and close the case.

**SO ORDERED.**